1    **UNITED STATES DISTRICT COURT**

2    **CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

3    **HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE**

4

5    **UNITED STATES OF AMERICA,            )**
                                            **)**
6                   **Plaintiff,            )    Case No.**
                                            **)**
7              **vs.                        )    CR 15–131–JFW**
                                            **)**
8    **TEOFIL BRANK,                        )**
                                            **)**
9                   **Defendant.            )**
     **—————————————————————————————————————)**

10

11

12
                        **REPORTER'S TRANSCRIPT OF**
13                           **TRIAL DAY 3**
                        **THURSDAY, JULY 9, 2015**
14                           **7:49 A.M.**
                        **LOS ANGELES, CALIFORNIA**
15

16

17

18

19

20

21

22    _____

23            **MIRANDA ALGORRI, CSR 12743, CRR**
           FEDERAL OFFICIAL COURT REPORTER
24         312 NORTH SPRING STREET, ROOM 435
            LOS ANGELES, CALIFORNIA 90012
25            MIRANDAALGORRI@GMAIL.COM


**UNITED STATES DISTRICT COURT**

```
 1                    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4        STEPHANIE YONEKURA
          United States Attorney
 5        BY:  KIMBERLY DENISE JAIMEZ
          BY:  EDDIE JAUREGUI
 6        BY:  RYAN WHITE
          Assistant United States Attorney
 7        United States Courthouse
          312 North Spring Street
 8        Los Angeles, California 90012

 9

10    FOR THE DEFENDANT:

11        HILARY L. POTASHNER
          Federal Public Defender
12        BY:  SEEMA AHMAD
          BY:  ASHFAQ G. CHOWDHURY
13        Deputy Federal Public Defender
          Central District of California
14        321 East Second Street
          Los Angeles, California 90012
15

16
      FOR THE VICTIM:
17
          SIDLEY AUSTIN, LLP
18        BY:  DOUGLAS A. AXEL
          BY:  ANAND SINGH
19        555 West Fifth Street
          Suite 4000
20        Los Angeles, California 90013

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**



M A S T E R   I N D E X

THURSDAY, JULY 9, 2015, 7:49 A.M.


Chronological Index of Witnesses

| Government's Witnesses: | Direct | Cross | Redirect | Recross | Voir Dire |
|---|---|---|---|---|---|

(None)

**UNITED STATES DISTRICT COURT**

```
 1                              EXHIBITS

 2

 3              THURSDAY, JULY 9, 2015; 7:49 A.M.

 4                              For         In     Withdrawn
 5     Exhibits            Identification Evidence  or Rejected

 6     201-A Transcript of Ex 201                       78

 7     202-A Transcript of Ex 202                       79

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          **LOS ANGELES, CALIFORNIA; THURSDAY, JULY 9, 2015**
                              **7:49 A.M.**
2                              ---

3          (The following proceedings were held in

4      open court out of the presence of the jury:)

5              THE COURT:  Good morning to all.  We're on the

6      record.  The jury is not present.  Counsel and the defendant

7      are present.  You can be seated.

8         The issues I want to discuss this morning, before we begin

9      closing arguments, are the Court's final rulings on the jury

10     instructions.  The Court has received last night the

11     Government's supplemental proposed jury instructions filed

12     on -- yesterday, July 8.  They're document no. 262, and the

13     defendant's objection to the supplemental jury instruction

14     proposed by the Government with respect to California law.

15     That's document no. 263.

16        Unless anybody has anything to add, I'm going to give you

17     my final rulings.

18              MR. CHOWDHURY:  Nothing from the defense.

19              MR. JAUREGUI:  No, Your Honor.

20              THE COURT:  All right.  As I indicated yesterday,

21     the Court concludes that the Government is required to prove

22     wrongfulness as an element of the offenses charged in Counts 1,

23     2, and 5, and the defendant is entitled to a claim of right

24     instruction.  The Government's argument to the contrary is

25     based upon its contentions that threats to publicly disclosed

information about a victim's private sexual conduct in order to
obtain property are inherently or always wrongful, and thus it
need not prove wrongfulness.  That was in the Government's
joint memorandum of law at page 8.

However, the Court believes that the Government's argument
is based upon facts that it will rely on to prove that
defendant induced Mr. Burns to part with property by the
wrongful threat of reputational harm.  In order to deprive the
defendant of a claim of right instruction, the Government would
be required to demonstrate in this case a wrongful threat of
reputational harm, not the facts that support that harm must
always be wrongful.

And unlike the threat and use of force of violence outside
the labor context, the threat of reputational harm is not
always wrongful.  And as the 2nd Circuit held in
*United States versus Jackson*, 180 F.3d 55, like threats of
economic harm, not every threat to make a disclosure that would
harm another's reputation is wrongful, and thus it's material
whether defendant had a claim of right to the money demanded.

Accordingly, I conclude that the jury must be instructed
on wrongfulness, and that definition must include a claim of
right instruction.

The Court will give its proposed wrongfulness instruction
on no. 13 that it provided to counsel yesterday which reads as
follows:

1    For purposes of Count 1, 2, and 5, a threat is wrongful if

2    defendant knew that he was not entitled to obtain the property

3    or that the threat had no nexus, that is, a connection to a

4    legitimate claim for money or property.

5    The Court's proposed instruction is a combination of the

6    9th Circuit Model 8.142A and the 2nd Circuit's decision in

7    *United States versus Jackson* at 180 F.3d 55.  The Court

8    concludes that the 2nd Circuit's opinion in *Jackson* that a

9    threat is wrongful if there is no nexus or connection to a

10   legitimate claim for money or property is appropriate in the

11   context of a threat of reputational harm.  The 9th Circuit

12   Model only covers extortion or attempted extortion by threat of

13   economic harm, not reputational harm.

14   In addition, although the Government has agreed to the

15   Court's proposed instruction, I think it's appropriate to state

16   for the record why I changed the Government's proposed

17   instruction.  First, the Court concludes that the Government's

18   proposed instruction that "A threat is also wrongful if it is

19   unlawful" is not appropriate based upon the facts of this case.

20   In this case the only unlawfulness alleged is under Counts 1,

21   2, and 5 which require wrongfulness.  Thus defining

22   wrongfulness as an unlawful threat creates a confusing circular

23   argument for the jury.

24   Second, the Government's proposed instruction did not

25   require that the Government prove that defendant knew that he

1   was not entitled to the property or the threat had no nexus to

2   a legitimate claim for the property.  The 1st Circuit in

3   *United States versus* -- S-t-u-r-n is the name of the case -- at

4   870 F.2d 769 which is a 1st Circuit case held that the

5   Government must prove that defendant knew he was not entitled

6   to the property.

7       The 9th Circuit has not yet ruled on the issue, but the

8   9th Circuit Jury Instruction Committee has recommended that,

9   until the Circuit rules, that the Court instruct that the

10  Government must prove the defendant knew that he was not

11  entitled to obtain the property, and it's Model Hobbs Act

12  instruction.

13      Third, the Court has added in the instruction that this

14  instruction applies to Counts 1, 2, and 5.  As the Court stated

15  yesterday, based upon the three cases that I cited, the Court

16  has concluded that 18 United States Code Section 875(d) also

17  has a wrongfulness element.

18      In reviewing my notes last evening from yesterday's

19  hearing, I realized that I had never addressed one of the

20  issues that defense counsel raised and that is specifically

21  whether Counts 2 and 5 should include a true threat requirement

22  in addition to a wrongful threat requirement.  I conclude that

23  Counts 2 and 5 do not have a true threat requirement.

24      The true threat requirement is necessary when a criminal

25  statute punishes a pure -- a form of pure speech, and that was

1   stated by the 9th Circuit in *United States versus* -- and the

2   case name is B-a-g-d-a-s-a-r-i-a-n, 652 F.3d 1113.  In order to

3   affirm a conviction under any threat statute that criminalizes

4   pure speech, we must find sufficient evidence that the speech

5   at issue constitutes a true threat.

6        Unlike 875(d), which punishes pure speech, the Hobbs Act

7   under Section 1951(a) does not punish pure speech.  Indeed,

8   extortion under the Hobbs Act requires that the defendant

9   induce the victim to part with property, and the attempted

10  extortion requires that the defendant did something that was a

11  substantial step toward committing the crime.

12       I have also reviewed the Government's proposed instruction

13  relating to the -- to Count 6, and I agree with the defendant

14  that the extensive instruction on California law will confuse

15  the jury because of the differences in the elements in

16  California -- under California law and federal law of extortion

17  which are explained in the instruction.  Moreover, as the

18  defendant points out, the proposed instruction offers no

19  guidance to the jury and conflicts with the wrongfulness

20  instruction that applies to Counts 2 and 5.

21       Finally, the Government has simply offered this

22  instruction too late, has had ample time since it submitted its

23  original instructions to recognize this issue and raise the

24  issue with the Court and counsel.  Accordingly, I'm not going

25  to give the Government's proposed instruction.

1       However, I will give the Government's interstate commerce
2  and foreign commerce instruction.  However, with respect to the
3  Hobbs Act, Counts 2 and 5, I've modified it slightly to
4  indicate that the effect need only to be reasonably probable,
5  not actual, and that's based upon the 9th Circuit case of
6  *United States versus Rodriguez* at 360 F.3d 949.
7       So that concludes the rulings on the jury instructions.
8            MR. CHOWDHURY:  Your Honor, defense would just --
9  two things.  First thing is I think yesterday I gave an
10 estimate of 20 minutes for the closing.  In running through it
11 last night, I think it might be 25 to 30.  I'm just letting you
12 know.
13           THE COURT:  All right.
14           MR. CHOWDHURY:  And we would move at this time under
15 Rule 29 for insufficiency of the evidence on the evidence of
16 the threat to reputation on Counts 1, 2, and 5 and the failure
17 of the Government to show that Mr. Brank knew he was not
18 entitled to the funds and the property that he solicited on
19 Counts 1, 2, and 5.  We believe the other counts follow on that
20 as well.  So that's our motion -- Rule 29 motion.
21           THE COURT:  All right.  That motion will be denied.
22       All right.  Are you ready?  We're going to bring in the
23 jury, and we'll have closing arguments.
24           MS. JAIMEZ:  Yes, Your Honor.
25 ///

```
 1          (The following proceedings were held in

 2      open court in the presence of the jury:)

 3          THE COURT:  Good morning, ladies and gentlemen.  As

 4  I indicated yesterday, the evidence portion of the case is now

 5  closed.  So we will now hear the closing arguments of counsel,

 6  and we'll begin with Government counsel.

 7          MS. JAIMEZ:  Your Honor, may it please the Court.

 8          THE COURT:  Yes.  Go ahead.

 9          MS. JAIMEZ:  People with deep pockets and dark

10  secrets are directly vulnerable to extortion.  The defendant

11  knew that Donald Burns had skeletons in his closet, skeletons

12  that Donald Burns feared could become public some day.  The

13  defendant used that fear to obtain an Audi r8.  He used that

14  fear to obtain a $500,000 wire transfer.  And he almost used

15  that fear to obtain a $1 million payday, but then he was

16  caught.

17      Ladies and gentlemen of the Jury, this is a case about

18  greed, greed and frustration.  The defendant became frustrated

19  with the victim Donald Burns when things didn't work out as he

20  planned.  The defendant planned to borrow Donald Burns'

21  Audi r8, but that didn't happen.  The defendant planned on

22  having an ongoing referral fee arrangement, but Donald Burns

23  said they didn't have a working relationship anymore after the

24  referral fee dispute.  So what did the defendant do?  He

25  decided to cash in on the secret he knew about.  He decided
```

1    that he would threaten to expose that secret unless -- unless

2    he got paid.

3         And as a result, the defendant is charged today with one

4    count of transmitting threatening communications in interstate

5    commerce with the intent to extort; Count 2, extortion; Count 3

6    and 4, receipt of extortion proceeds, specifically the Audi and

7    the $500,000 wire transfer; Count 5, attempted extortion; and,

8    Count 6, use of an interstate facility, in other words, a cell

9    phone, to facilitate an unlawful activity, and in this case

10   extortion.

11        Now, in order for you to find the defendant guilty of

12   these counts, you're going to have to find that the evidence

13   shows he committed these counts beyond a reasonable doubt.

14   That's the Government's burden, and we embrace that burden.

15   The one thing to remember, however, that it's not proof beyond

16   all doubt because everything is open to some doubt.  However,

17   in this case the Government has more than met its burden.  The

18   evidence speaks for itself.  The evidence quite literally says

19   extortion.  The defendant in text messages says to

20   Donald Burns, "How do I know you won't report me for

21   extortion?"  The defendant says in another text message, "Who

22   wants to be friends with blackmail?"

23        So let's consider each of the counts.  First, Count 1,

24   transmitting threatening communications in interstate commerce.

25   What do you have to find in order to convict the defendant

UNITED STATES DISTRICT COURT

```
1   under Count 1?  First, you have to determine whether or not the
2   defendant knowingly sent a communication containing a wrongful
3   and true threat to injure the reputation of Donald Burns.
4   Next, you'll have to determine whether or not the defendant did
5   so with the intent to extort money or something else of value.
6   Next, you'll have to determine whether or not there was an
7   effect on interstate commerce.
8        Now, with respect to the first element, you'll remember
9   you have to determine whether or not there's a communication
10  containing a true threat that is wrongful.  How will you know
11  what a true threat is?  The Court is going to provide you jury
12  instructions here shortly, but let's go over it briefly.
13       A true threat has both an objective standard as well as a
14  subjective standard.  Under the objective standard, you're
15  going to have to determine whether or not a reasonable person
16  would consider the threat to be a serious expression of intent
17  to injure when taken in context.
18       There's also a subjective standard to the true threat
19  analysis.  You have to determine whether or not the defendant
20  intended for his threat to be understood or for his
21  communication to be understood as a threat.
22       Now, what about wrongful?  How will you determine whether
23  or not a threat is wrongful?  You'll also receive an
24  instruction from the Court on this matter, but specifically a
25  threat is wrongful if the defendant knew he was not entitled to
```

UNITED STATES DISTRICT COURT

14

```
 1    the property or if the threat had no nexus or communication to

 2    a legitimate claim to property.

 3          So let's consider how will you determine whether or not

 4    the defendant sent communications with the true threat wrongful

 5    with the intent to injure the reputation of Donald Burns?

 6    We're going to have to look at the communications themselves

 7    which we'll do in just a moment.  But before we look at the

 8    communications, we'll have to consider the context.  As I

 9    mentioned before, in order to analyze whether or not something

10    is a true threat, you have to look at the context.  What is the

11    context here?

12          Here you heard testimony from Donald Burns that the

13    defendant and he had a referral fee arrangement in which

14    Donald Burns would pay the defendant somewhere between 1,500

15    and $2,000 for referrals, referrals of individuals that would

16    have sex with Donald Burns.  That worked out for a while.

17    However, in January of 2015 of this year, one of those

18    referrals didn't come to be, but the defendant got a $2,000

19    advance.  When the referral didn't happen, the defendant

20    refused to return the advance, and there became a rift in the

21    relationship.  The two stopped communicating until all of a

22    sudden.

23          All of a sudden the defendant opens communications as we

24    see in Exhibit 108, the extraction from the victim's cell

25    phone.  And what does he say?  "So another month has passed,
```

and you broke your word again.  Tisk.  Tisk."  You'll remember
that in response Donald Burns, who didn't know really what was
happening at this point, just sent a question mark, and the
defendant clarified, "The car.  How can we work if trust is
broken?"

Donald Burns goes on to respond in text message saying, "I
think we don't have a working relationship anymore.  The $2,000
advance" -- referring to that 2015 advance -- "is an
outstanding issue.  You're right that I'm not interested in
making a big deal out of it, but I'm not comfortable working
together after that."

What happened next?  The defendant responds, "Be wise on
how you reply.  I can bring your house down, Don.  This was a
simple conversation, and you throw this shit on me.  Don't get
me mad.  I do have a Twitter and your photos.  Lies can be
made, or maybe it's the truth."

Now, you heard Donald Burns testify that he understood
these text messages to mean that the defendant was willing to
expose their pay-for-sex relationship on his Twitter account.
This was worrisome for Donald Burns.  Why?  Because the
defendant was a well-known pornography actor by the name of
Jarec Wentworth.  He had a significant Twitter following, and
Donald Burns was afraid what would happen if something was
posted.

So Donald Burns wrote back, tried to get more information,

1    tried to calm the defendant down even by saying, "Happy for you

2    to have the dough, but don't want people pissed off at me all

3    the time.  That's why I haven't bothered you since we last

4    chatted."

5         However, the defendant did not calm down.  The defendant

6    responded, "You're not nice.  You're rude, self-centered

7    narcissist.  I was only trying to be a friend and throw you

8    boys."  Here of course we know that he's referring to the

9    referral fee arrangement in which the defendant would refer

10   pornography actors to Donald Burns for sex.  The defendant goes

11   on to say, "But you argue with me over little things and expect

12   me to take it?  You of all people know I bite when someone

13   corners me.  You didn't hold your word twice on the car, and

14   that gets me upset.  Trust is what works, and you break them.

15   Maybe you need a taste of it."

16        You heard Donald Burns testify that at this point he was

17   not sure what car the defendant was talking about.  However,

18   you did hear from Etienne Yim, an associate of the defendant,

19   who told you that the defendant had always wanted to borrow the

20   Audi r8 and that was a point -- that was an issue for him.

21        Soon after in the text exchange the defendant goes on to

22   clarify for Donald Burns what he's referring to.  He says, "You

23   promised me you would let me drive the r8.  Cars are my life.

24   You know that," he says.  "Show I'm nothing to you.  Promises

25   broken.  I'm feeling evil right now."

**UNITED STATES DISTRICT COURT**

1       And you'll remember that Donald Burns said that that

2   scared him.  The defendant hadn't used that type of language

3   before.  So he responded again, trying to calm the defendant

4   down, "Dude, you're so pissed.  You're talking about blowing me

5   up on Twitter.  Remember, I tracked you down because I liked

6   your energy and we have had fun hanging out.  If we annoy each

7   other, then we should call each other assholes and put it

8   behind us, not all this bad energy.  Right?"

9       But instead of putting it behind him, the defendant did

10  the opposite.  The defendant got mad.  He wrote to

11  Donald Burns, "Check my Twitter.  The conversation will grow

12  and questions will be asked.  You lied to me and treated me

13  like shit.  I asked again, and you put it behind you.  Now it's

14  biting your ass."

15      Remember, you heard from Justin Griggs yesterday who

16  testified that he spoke with the defendant soon after these

17  text messages were going over to find out whether or not the

18  defendant was serious, to find out whether or not he was

19  joking.  And what did the defendant tell Justin Griggs?  He

20  said that, "This is me biting Don in the ass."

21      The defendant went on to write to Donald Burns, "I think

22  by the time I'm out of the gym, you will have a sweet treat for

23  me that will make me erase my tweet.  Think hard.  You know me;

24  right?"

25      And so, as directed, Donald Burns attempted to check

1    Twitter to find out what had happened.  And sure enough, there
2    was a tweet.  There was a tweet on the defendant's
3    Jarec Wentworth Twitter account naming Donald Burns by name
4    asking, "How many porn stars know a man named Don?  Yes, Don."
5    And you heard from Donald Burns that he interpreted that tweet
6    to be a warning, to be an indication that the defendant was
7    serious and that more was to come unless he received, quote, "a
8    sweet treat."  But he didn't know what that was at the time.
9        However, Donald Burns testified he was worried at this
10   point, he was fearful because, as we all know, as you know,
11   social media spreads quickly.  And, in fact, he soon found out
12   that this tweet was retweeted on a blogger -- on a blog website
13   indicating that the information was already starting to gain
14   traction.
15       Then he heard from the defendant again.  "I can't get
16   friendship anymore because who will want to be friends with
17   blackmail?  I only wanted to drive the cars and enjoy your
18   company.  I guess finding you boys is out of the picture.  So
19   it leaves me with nothing to want out of this.  So I'm just
20   going to bite hard.  You got money, but I don't want that.
21   Money won't wash away what people will read and see of you.
22   Wow, I guess I hold the cards now."
23       Donald Burns responded, "Teo, I can't call you right now."
24   Remember, at this time he's in a boatyard in Vancouver,
25   Washington.  "But please just tell me what you want me to do,

1   and please take down posts about me."

2       And soon after the defendant responds exactly what he

3   wants.  "I want a new car, motorcycle, and both hands full of

4   cash."  Then -- then I'll erase it and you.  He goes on to

5   clarify exactly what he wants, "The r8, $250,000.  Have the

6   money in the car with the title.  Simple.  And make your

7   calls."

8       We heard from Donald Burns yesterday that, soon after

9   these texts, they had a conversation at approximately

10  12:00 p.m. on February 16, 2015.  Donald Burns tried to explain

11  to the defendant that it was a bank holiday, there was no way

12  he could get him $250,000 immediately.  What did the defendant

13  say?  Fine.  He doubled the request to $500,000 by the next day

14  plus the Audi r8.

15      Now, some of you might be asking at this point why was the

16  defendant or why -- excuse me -- was the victim Donald Burns so

17  willing to comply immediately with these requests?  But

18  remember, as he testified to yesterday, he was worried that,

19  one, more information would get out there; and, two, it would

20  spread quickly.  So he had to move quickly, and he did.  He

21  wired the money, and he allowed the defendant to obtain

22  possession of the Audi.

23      So let's consider element one or the first item you have

24  to consider in connection with Count 1.  Did the defendant

25  knowingly send a communication containing a wrongful and true

1    threat?  Yes, he did.  In fact, he even mentioned "blackmail"

2    in his communication.  He references or implies that

3    Donald Burns' reputation would be affected by saying, "Money

4    won't wash away what people will read and see about you."  He

5    references his Twitter account.  And he's very clear that he

6    wants money, property.  Then he would erase the post.

7         The next item you'll have to consider in order to find the

8    defendant guilty of Count 1, transmitting threatening

9    communications, is whether or not the communications traveled

10   in interstate commerce.  Now, a communication travels in

11   interstate commerce if it goes from one state to the next, and

12   here we heard evidence of just that.  The victim testified that

13   he was in Vancouver, Washington, when he received the original

14   February 16 text messages.  You also heard testimony that

15   defendant was in California at the time.

16        In the exhibits you'll see Exhibit 175 which was admitted.

17   In Exhibit 175, there's cell site data that shows that

18   defendant's Samsung phone pinged off cell towers in the

19   Los Angeles area on February 16, 2015, further confirming that

20   he was in California while the victim was in Vancouver,

21   Washington, when these messages took place.  As such, they

22   traveled in interstate commerce.

23        The next item you'll have to consider, did the defendant

24   send the communication with the intent to extort money or

25   something else of value?  Now, in determining the issue of what

1    an individual's intent is, you'll have to consider a number of

2    things because obviously you're not going to know what's in the

3    defendant's head.  But what you'll have to look at are his

4    statements and his conduct, and his conduct and his statements

5    confirmed that he acted with the intent to extort money or

6    something of value.

7         He conditions erasing the tweet on getting additional

8    money.  He explicitly demands the Audi r8 and thousands of

9    dollars.  And he told Etienne Yim, his friend, who traveled

10   with him to Las Vegas to celebrate, he told Etienne Yim that he

11   had blackmailed Donald Burns.  And, of course, he told Griggs

12   on the day the messages were sent that he was biting

13   Donald Burns in the ass.  He didn't tell anyone that he was

14   entitled to the property.  He didn't tell anyone that

15   Donald Burns promised that he could get it.

16        What's more, the defendant even says in his own text

17   message, before he sends his routing information so he could

18   get the $500,000, he says, "How do I know you won't report me

19   for extortion?"  Clearly there's an intent to extort, but

20   nevertheless, he sent his routing information.

21        The evidence supports each of the elements, each of the

22   requirements for holding the defendant accountable under

23   Count 1.  The defendant knowingly sent a communication

24   containing a wrongful and true threat to damage the reputation

25   of Donald Burns, defendant did so with an intent to extort, and

1    the communication traveled in interstate commerce.

2         Now let's consider Count 2, extortion.  You'll have to

3    consider whether or not, number one, defendant induced the

4    victim to part with property by wrongful threat of reputational

5    harm.  Two, you'll have to decide whether or not the defendant

6    acted with an intent to obtain property.  Three, you'll have to

7    determine whether or not interstate commerce was affected in

8    some way in order to find the defendant guilty of extortion.

9         Now, this charge, like Count 1, relates to the defendant's

10   conduct on February 15 of this year.  It relates to the initial

11   extortion threats.  So did the defendant induce the victim to

12   part with property by wrongful threat of reputational harm?

13   The facts we just discussed apply here.  Yes, he did.  He sent

14   text messages, text messages that you'll see summarized in

15   Exhibit 108 back in the jury room, texts that threaten to bring

16   Don's house down, texts that referenced the defendant's Twitter

17   account.  Then he placed a warning tweet on his Twitter account

18   showing the victim that he was serious.

19        He did, in fact, induce the victim to turn over his

20   property because, as we saw evidence, there was a $500,000 wire

21   transfer from the victim's Goldman Sachs account to the

22   defendant's Wells Fargo account, and of course the defendant

23   obtained the Audi r8.

24        You saw the bank records yourself.  Exhibit 105 showed the

25   bank transfer.  You heard testimony that the defendant obtained

1    the Audi r8.  You heard that testimony from Etienne Yim as well

2    as from Donald Burns.  You also heard that there were photos

3    extracted from his Samsung phone of the Audi r8 which you'll

4    see at Exhibits 147 and 148 all indicating that he, in fact,

5    was able to induce Donald Burns to part with his property based

6    on his threats of reputational harm.

7         Next, did the defendant act with the intent to obtain

8    property?  Again, you'll have to look at his statements and

9    actions to determine his intent.  What did he do?  Well, he

10   sent his routing information and his banking information to

11   ensure that he would get the $500,000 transfer.  He drove from

12   Los Angeles where he was initially -- remember Exhibit 175, the

13   cell site map that put him in Los Angeles, he drove from there

14   to San Diego to meet Mary, the victim's housekeeper, so he

15   could pick up the Audi r8 on February 16.  He demanded title to

16   the Audi r8 and insurance.  And the texts are clear about what

17   his demands were.  He wanted a car.  He wanted both hands full

18   of cash all indicating his intent to obtain property.  And, of

19   course, you heard about the Las Vegas trip from Etienne Yim.

20   After he in fact obtained the property as he intended to do so,

21   he went to Vegas to celebrate in the Audi r8.

22        The next element you'll have to consider before you can

23   convict under Count 2 extortion is interstate commerce.  You'll

24   receive an instruction on interstate commerce, but essentially

25   you'll have to determine whether or not this extortion had some

1   reasonably probable effect on interstate commerce even if it

2   did not have an actual effect.

3        Here the parties had a stipulation that there was, in

4   fact, a wire transfer from New York to California and that the

5   $500,000 traveled in interstate commerce.  That stipulation is

6   found in Exhibit 501.  You also heard testimony from

7   Donald Burns about Marine Investco, LLC, his yacht building

8   company, where he was when he received these threats.  And he

9   indicated that, had he not paid the $500,000 to defendant that

10  day, it would have gone to this building project.  Therefore,

11  interstate commerce was affected.

12       So the evidence is clear the defendant induced the victim

13  to part with property by wrongful threat of reputational harm.

14  Defendant acted with the intent to obtain property, and

15  interstate commerce was affected.

16       Now, Counts 3 through 4, receipt of extortion proceeds.

17  These counts relate, as I mentioned before, to the Audi r8.  He

18  received that and the $500,000 wire transfer.  Before you can

19  find the defendant guilty of Counts 3 through 4, you'll have to

20  determine, first, whether or not defendant received, possessed,

21  concealed, disposed of money or other property.  And we just

22  discussed that.  Yes, he did.  He received the Audi.  He

23  received the wire transfer.

24       Next you'll have to decide whether or not the property was

25  obtained by committing the offense charged in Count 1, namely,

transmission of threatening communications with the intent to

extort.  We already talked about Count 1, and the evidence

supports Count 1.  So the question is, with respect to element

no. 3, did the defendant know that the money or property he

obtained had been unlawfully obtained?  And yes, he did.  How?

Because he obtained it unlawfully.  Also, by his own comments

to his friend Etienne Yim.  He told Etienne Yim that he got the

Audi r8 via blackmail.

He mentioned in his text messages just before he sent his

routing information, "How do I know you won't report me for

extortion?  He didn't say, "When are you going to pay me that

$500,000 you promised me?"  No.  He referenced extortion and

blackmail.  He knew the property was unlawfully obtained.

And then there's the defendant's conflicting stories about

how he obtained the Audi r8.  Remember, Agent Winning testified

yesterday about his analysis of the defendant's phone and how

he found certain multimedia text messages or messages in the

phone containing pictures of the Audi r8 which defendant sent

to family and friends.

In Exhibit 141 he says, with the picture of the Audi r8,

"Just bought this."  But then in Exhibit 142, again with a

picture of the Audi r8 to another person, "Look what I just

inherited."  Conflicting stories evidencing the fact that he

knew he had obtained this property unlawfully and possessed it

unlawfully.  Therefore, the evidence supports Counts 3 through

4, receipt of extortion proceeds, because the defendant
possessed money and property, the Audi, the $500,000.  He
obtained it by committing the offense we discussed about in
Count 1, and he knew that he had the money and property
unlawfully.

Count 5, what do you have to find in order for you to
convict the defendant of Count 5?  Count 5 relates to
defendant's behavior in March of this year.  You'll recall in
March of this year the defendant renewed his demands, but
before you can convict him for his March behavior, you'll have
to decide the elements.  You'll have to decide whether or not
defendant intended to induce the victim to part with property
by wrongful threat of reputational harm in March.  You'll have
to decide whether or not defendant acted with the intent to
obtain property in March, whether or not interstate commerce
could have been affected, and whether or not the defendant did
something that was a substantial step toward committing the
crime of attempted extortion in March of this year.

So did the defendant intend to induce Donald Burns to part
with the property yet again by wrongful threat of reputational
harm?  Even before March you'll recall that Donald Burns
testified that two days after the wire transfer he received
another demand.  He received a text message saying, "Throw me
another half a mill.  We'll be done for sure.  No more asking.
No more taking.  My word.  Promise.  Going to erase all of

1    Jarec."  And here again he's referring to the Jarec Twitter

2    page.  "No Twitter, no nothing.  All gone and safe for you.

3    This will make me disappear."

4         And what happened afterwards?  The victim testified that

5    he began negotiating with the defendant essentially trying to

6    stall him while the victim determined what he could do.  And he

7    proposed to the defendant that he was going to pay the

8    defendant $50,000 for five years while the victim went to

9    research what he should do.  And then of course there is the

10   March 3rd new deal text which the victim received while he was

11   with the FBI in the Los Angeles office.

12        Exhibit 101 shows the new deal text which Donald Burns

13   received live in front of the FBI.  In the new deal text, the

14   defendant clarifies that he's not interested in the

15   spread-out-over-time deal he says.  He says the account will be

16   deleted, again, referencing the Twitter account, referencing

17   the reputational harm that he's threatening.  The account will

18   be deleted if the new deal is reached.  And then he finishes

19   the text exchange by threatening "One million cash."

20        So did the defendant, in fact, threaten reputational harm?

21   Did the defendant use a wrongful threat in this instance?

22   You'll recall that both Agent Sterle and the victim told you

23   about an undercover operation that occurred just after

24   receiving these new deal texts that occurred the next day on

25   March 4.  In the undercover operation, the defendant went to go

1   and try to pick up the $1 million from an undercover agent.

2   What did he do when he went to go pick up the $1 million?  He

3   had his hoodie up.  He went in and sat down awkwardly.  He had

4   his voice low.  He asked Agent Sterle, "What do you have for

5   me?"  This is not the behavior of someone who thinks that

6   they're entitled to $1 million, therefore, indicating that his

7   threat was wrongful also with respect to the attempted

8   extortion.

9        So did the defendant act with the intent to obtain

10  property?  Again, you'll have to look at his actions, at his

11  communications.  He sent the new deal text, Exhibit 101.  "New

12  deal, new deal.  Not doing the spread-out-over-time thing.

13  Account will be deleted if new deal is reached."

14       He requested his friend Etienne Yim drive him from

15  San Diego to the L.A. area, specifically the El Segundo

16  Starbucks.  He obtained a firearm from Etienne Yim's friend

17  Benjamin Williams to ensure that he would be protected when he

18  went to go pick up his $1 million, further evidence that he

19  intended to walk away with property.

20       And then you can look at his demeanor and photos on

21  March 3rd, 2015, just before the undercover operation.  He

22  appears elated in Exhibit 115, gloating even.  He has already

23  obtained a $500,000 wire transfer, an Audi r8 valued at

24  approximately $180,000, and he's on his way to pick up another

25  million dollars.  Obviously he had intent to obtain property.

        Did this action, did this conduct affect interstate
commerce in some way, or, rather, could it have affected
interstate commerce in some way?  You heard testimony yesterday
from Donald Burns that he is a businessman and he engages in
business nationwide.  He has a boat building project in
Vancouver, Washington.  He has homes in California, Florida,
Nantucket.  And he does charitable donations of various
charities.  He also testified that the first $500,000 came from
his Goldman Sachs account.  Therefore, it's reasonable to infer
that, if he had paid the $1 million, it would have somehow
affected in some small way interstate commerce.

        Element 4, did the defendant do something that was a
substantial step toward committing the attempted extortion on
March 4, 2015, when he went to go pick up the $1 million at the
El Segundo Starbucks?  We've already discussed it.  He did a
number of steps.  He sent the three -- the March 3rd new deal,
new deal text demanding the $1 million.  He traveled from
San Diego to El Segundo.  He obtained a firearm.  All of these
are substantial steps, and all of these evidence the fact that
he, in fact, committed Count 5, attempted extortion.  Defendant
intended to induce the victim to part with additional property,
$1 million.  He acted with the intent to obtain the $1 million.
Interstate commerce very well could have been affected, and the
defendant did more than a substantial step toward committing
that crime.

1      Count 6, use of an interstate facility to facilitate

2  extortion.  Now, before you can find the defendant guilty of

3  Count 6, the final count, you'll have to decide whether or not

4  the defendant used a facility of interstate commerce.  And I

5  explained before that's simply -- it's a telephone -- whether

6  or not he used that facility with the intent to carry on or

7  facilitate an unlawful activity which we know in this case is

8  extortion.

9      You'll have to decide whether or not, after using the cell

10  phone, defendant attempted to carry on or facilitate extortion.

11  We've talked about that in Count 5.  And then you'll have to

12  decide whether or not defendant did something that was a

13  substantial step toward committing extortion.  Again, we talked

14  about that.

15      So let's consider Count 1 or whether -- element one with

16  respect to Count 6.  Did the defendant use a facility of

17  interstate commerce or cellular telephone with the intent to

18  carry on extortion?  Yes, he did.  In fact, the cell phone was

19  his principle tool for carrying on the extortion.  You saw the

20  cell phone in Exhibit 604, the physical cell phone.  You also

21  saw a photo of the cell phone during Scott Saul's, the forensic

22  examiner's, testimony.  And it's also pictured here.

23      You heard Scott Saul testify to the extraction he did on

24  the defendant's phone which further corroborated the extortion

25  as testified to by Agent Winning who went through the

1    extraction from this phone.  It contained text messages.  It

2    contained photos.  It contained e-mails all corroborating this

3    extortion.

4         And of course elements two and elements three have already

5    been discussed.  The defendant did carry on or attempt to

6    commit extortion.  The 101 -- the new deal text that you see in

7    Exhibit 101 evidence that, the trip from San Diego to

8    El Segundo to pick up the $1 million, and of course the firearm

9    that he obtained for his protection so that he could make sure

10   he could get his $1 million.

11        Therefore, the evidence supports a guilty verdict of

12   Count 6.  The defendant used a facility of interstate commerce.

13   He used the cell phone to facilitate his extortion.  After

14   using the cell phone, defendant attempted to perform acts to

15   facilitate the extortion, and he did something that was a

16   substantial step toward committing the extortion.

17        Now, you heard at length Donald Burns testify to the fact

18   that he had fear of various types of reputational harm.  He was

19   afraid that, if the threats came to be, there would be harm to

20   his personal relationships, lost business opportunities, and

21   inability to donate wherever he wanted because people may not

22   want to deal with him after they find out the details of what

23   happened, potential higher interest rates in financing, and of

24   course embarrassment and humiliation which he's already

25   experienced as a result of this trial.

1          These are the types of harm that he feared when the

2     defendant began making his threats, and these are the types of

3     harm that the defendant leveraged to obtain the property that

4     he got.  He leveraged these fears to obtain the Audi, the

5     $500,000 wire, and almost to obtain another million dollars.

6     He used a cell phone in connection with his extortion scheme

7     and the communications traveled in interstate commerce.

8          Ladies and gentlemen of the Jury, the defendant is guilty

9     of Counts 1 through 6, and the United States asks that you find

10    the defendant guilty on all charges.

11         Thank you.

12              THE COURT:  All right.  Thank you.  Now we'll hear

13    from the defense.

14              MR. CHOWDHURY:  Thank you, Your Honor.

15              THE COURT:  You may proceed when you're ready.

16              MR. CHOWDHURY:  Thank you, Your Honor.

17         My client, Teofil Brank, he didn't extort Don Burns.  He's

18    not guilty of these charges.  This case is about three

19    things -- relationships, reputation, rules.

20         Relationships, you heard about the kinds of relationships

21    Don Burns has.  You heard about the relationship or heard a

22    little bit about the relationship that he had with Mr. Brank.

23    Was it business?  Was it personal?  I would suggest it was

24    complicated.

25         Reputation, you heard Mr. Burns lives in a glass house,

 1    literally and figuratively.  He wasn't hiding anything.  The
 2    Government just got up and told you Donald Burns was afraid he
 3    was going to be exposed as someone that used pay-for-sex
 4    transactions, engaged in pay-for-sex transactions.  You heard
 5    the evidence.  You heard Mr. Burns himself that Donald Burns
 6    engaged in pay-for-sex transactions may be the worst kept
 7    secret ever.
 8        We were worried -- we were told that he was worried the
 9    cat was going to be let out of the bag.  We were told that
10    Mr. Burns was so scared that this cat was going to be let out
11    of the bag.  There are lots of cats out of the bag, cats
12    running around everywhere.  This was the worst kept secret
13    maybe ever.
14        And rules, you heard about Donald Burns' world, and we
15    learned that in Donald Burns' world different rules apply,
16    different rules than apply to the rest of us, different rules
17    than we experience in our lives.
18        Let's start by talking about the different rules in
19    Donald Burns' world.  What is that world?  The prosecutor just
20    told you Donald Burns doesn't just own yachts.  He owns a
21    company that makes yachts.
22        Mr. Burns has enormous wealth.  He sold his company for
23    $1.1 billion.  He's worth $138 million.  The prosecutor told
24    you Mr. Burns told you he has houses.  He has houses in
25    San Diego, in Nantucket, in Palm Beach.  He flies on private

1   jets.  He moves around in the most elite circles of the world.

2   He's in Paris meeting with the American ambassador of France

3   with his porn star friend.  And with that different world that

4   Mr. Burns lives in are different rules.

5        What do we know about that?  Different rules apply to

6   Mr. Burns.  He walked into the FBI office with his attorney,

7   with his private investigator that he had retained.  Didn't

8   report this supposed extortion right away.  Had his

9   investigation team work up on it.  He has an investigation

10  team, some private investigation team.  He has an attorney

11  advise him for a while.  They decide who should we talk to?

12       He walks into the FBI's office, and he says I believe I'm

13  a victim of extortion by Mr. Brank.  We've had this

14  relationship going back two years.  I pay for sex.  I pay him

15  to bring other people for sex.  Here's my phone.  You can

16  search it between the dates of February 16, 2015, and

17  March 4, 2015.  That's about two weeks.  Mr. Burns says just

18  search two weeks of my phone.  Search two weeks of my phone.

19  Nothing more.  There's a lot of private stuff on my phone.

20  Don't search anything else.  Just search that.  And what does

21  the FBI say?  The FBI says, yes, Mr. Burns.  That's what we'll

22  do.

23       You heard from Agent Bouman yesterday.  He told you he

24  wanted to search for more on Mr. Burns' phone beyond that two

25  weeks out of two years.  He wanted to search for more.  He said

1   he could have -- could have gotten a search warrant, could have

2   searched for more, but he didn't.  Why didn't the FBI search

3   for more on Mr. Burns' phone?  Because Mr. Burns didn't want

4   them to.  There are different rules that apply to someone like

5   Mr. Burns.

6        Mr. Burns is telling the FBI I'm engaged in prostitution,

7   I'm flying people, young men to engage in prostitution at my

8   house and paying them.  Mr. Burns is not charged with anything.

9   He says he doesn't have immunity.  Did he look like someone who

10  is worried that he's going to get charged with anything?  Did

11  he seem to you like he's worried that I'm admitting under oath

12  to all sorts of criminal activity?  Did he look like he was

13  worried he was going to get prosecuted for anything?  Different

14  rules apply for someone like Mr. Burns.

15       Let's talk about that phone again for a second.  Why

16  didn't Mr. Burns want the FBI to look beyond that two weeks?

17  Two weeks out of two years.  Tiny little sliver of time.  The

18  FBI knows that Mr. Burns and Mr. Brank have had this

19  relationship going back for two years, but Mr. Burns wants them

20  to only look at two weeks on his phone, and that's what they

21  do.  They wanted -- the FBI wanted to look for more.  They

22  could have looked for more, but they didn't.  Different rules

23  apply to someone like Mr. Burns.

24       Now, what was on that phone?  The rest of the two years,

25  beyond the two weeks that Mr. Burns said, that's okay, FBI, you

1    can look at that but nothing else because I've got private

2    stuff on there.  What was on that phone?  Surely there was a

3    lot about the relationship between Mr. Brank and Mr. Burns that

4    had been going on since 2013 for two years.

5         The Government got up, read you these text messages that

6    start on February 16, 2015.  Mr. Burns read them out on the

7    stand the other day.  And the Government and Mr. Burns would

8    have you believe that the conversation that started there came

9    out of the blue from nowhere.  Mr. Burns had no idea what this

10   was all about.  It just came out of nowhere.  Look at those

11   text messages.  Look at them.  That's a conversation in

12   midstream, a conversation that's been going on for two years, a

13   conversation that has involved promises, promises broken, words

14   not kept.  We know there's more to it.  The Government didn't

15   choose to tell you about that.  They didn't choose to show you

16   that.

17              MS. JAIMEZ:  Objection, Your Honor.  Facts not in

18   evidence.  There are no --

19              THE COURT:  The objection is overruled.

20              MR. CHOWDHURY:  It's a different world, different

21   rules.  The Government doesn't want you to hear about that.

22        Mr. Burns and the Government tried to portray this

23   relationship that Mr. Burns and Mr. Brank had as just

24   transactional.  Apparently Mr. Burns -- the Government wants

25   you to think of Mr. Brank as just another one of the people

1    that Mr. Burns hires to do things.  He hires attorneys.  He

2    hires private investigators.  He buys yacht companies.  He has

3    someone in San Diego that lives at his house when he doesn't

4    live there because he has other houses.  He says Mr. Brank is

5    just an employee.  I pay him for the sex.  That's what it is.

6    It's an arm's length transaction.  There's nothing more to it.

7        Look at the texts that we do have.  That's not simply a

8    business relationship.  It's personal.  They're both talking

9    about the good times when they were friends.  It's much more

10   than just the envelopes of cash that you heard about from

11   Justin Griggs.  It's much more than just that.  How do we know

12   that?  Mr. Burns was asked, well, you paid for sex with

13   Mr. Brank a number of times.  Was there ever a time you didn't

14   pay him for sex?  And he says, no -- well, wait.  Hold on a

15   sec.  There was that one time at the Bel-Air Hotel.  I called

16   Mr. Brank.  Mr. Brank came over, and he was my guest.  Did you

17   pay him?  No.  No.  Exactly the opposite, Mr. Burns said.  I

18   told him I was unable to pay.  Those are his words.

19       Mr. Burns who, as he told you, was carrying on multiple,

20   multiple pay-for-sex encounters all over the country.  He was

21   worth $138 million who supposedly pays these young men that he

22   pays for sex 2,000, $1,500.  He told you he didn't care about

23   the $2,000 in Massachusetts.  He doesn't care about that amount

24   of money.  He said he was unable to pay.  That was his

25   testimony on the stand under oath to you.  He was unable to

```
 1   pay.  Does that make any sense?
 2        The Government wants you to believe someone who goes up
 3   there, admits he's worth $138 million, says he was unable to
 4   pay for the night of sex with Mr. Brank.  Maybe it's a
 5   Goldman Sachs account that's been cleaned out.  Maybe he was
 6   worried about checks bouncing.  Different rules apply to
 7   someone like Mr. Burns apparently.
 8        What do we know about the kinds of relationships Mr. Burns
 9   had with porn stars, porn stars like Mr. Brank?  We heard about
10   Mr. Amadon, Mackinzie Amadon.  We heard about Justin Griggs.
11   It worked out for Mackinzie Amadon.  Mr. Burns kept his
12   promises, kept his word.  He wasn't just offering Mr. Amadon
13   the cash.  He was offering him a promise to lift you out of
14   porn, to change your life, to make things better for you, to
15   introduce you to the right people, to pay for school, to give
16   you a monthly stipend.  He gave him $200,000 over a year and a
17   half and God knows how much more flying him to Paris taking him
18   to the finest restaurants.  Mr. Burns says, well, they weren't
19   always fancy.  Perhaps every now and again they slummed it and
20   went to In-N-Out.  But you saw how that changed for Mr. Amadon.
21        Mr. Burns is proud.  He's no longer in porn.  Mr. Amadon's
22   videos are still out there.  His Sean Cody's videos -- his porn
23   videos are out there.  But Mr. Burns carried through on the
24   promises to Mr. Amadon.  Mr. Griggs, he told you he felt, yeah,
25   maybe I should have gotten $150,000.  He told you he was upset
```

1    when he found out that Mr. Brank was getting money, was getting

2    paid by Mr. Burns.  Mr. Griggs felt it was unfair.  "I did so

3    much for him just as Mr. Brank.  What did he do?"  Mr. Griggs

4    was his friend.  He talked to him.  He had sex with him.  He

5    felt that they had a friendship, and part of that friendship

6    Mr. Burns would offer him some more money if you brought him --

7    if Mr. Griggs would bring him more young men.

8        And Mr. Burns treats these young men like this -- he

9    treats these young men like this.  He makes these promises, and

10   he wants to tell us, here, they don't mean things to me.

11   Mr. Amadon, that's different.  But Mr. Brank didn't mean

12   anything to me.  He stopped communication with Justin Griggs.

13   Justin Griggs was discarded.  Mr. Brank was discarded.  People

14   are disposable.  Some people collect cars.  Mr. Burns had a

15   number of cars.  He didn't know which car Mr. Brank was

16   referring to initially.  It's a nice problem to have.  Too many

17   cars you lose track which car we're talking about.  Some people

18   collect stamps.  Mr. Burns collects young men and has

19   apparently an insatiable appetite, and he would tell us they

20   don't mean anything to him.

21       But we saw Mr. Brank believed -- obviously you can see

22   from the texts that you do have that it was something more,

23   that there were promises, that he expected something more just

24   like Mr. Amadon got, maybe even more.  It's not simply a

25   business transaction.  It's not that.  It's complicated.

1    And how much is that worth?  You'll see in the

2    instructions -- and the Court will tell you -- the Government

3    has to show that Mr. Brank knew he's not entitled to what he

4    asked for, that it wasn't a legitimate claim.  Who's telling us

5    that it was too much?  Mr. Burns.

6    Did we hear from any expert that told us what the value of

7    everything that Mr. Brank did for Mr. Burns, what that was?

8    Does anyone know?  I don't know.  Do you know?  Who's telling

9    us?  Mr. Burns is telling us that's too much.  He paid the

10   500,000, gave him the car.  But the million, that was too much.

11   Is there somewhere we can check?  Can we check somewhere on

12   Amazon?  eBay?  Zillow?  Is there a stock market somewhere for

13   these kinds of transactions and this kind of relationship?  It

14   doesn't fall into any neat little box, sex, bring other young

15   men, be your friend, be your companion.  How much is that

16   worth?  And if you don't know and we don't know, the Government

17   has given us nothing to know what all of that was worth.  If we

18   don't know, how can we find that the Government has shown

19   Mr. Brank knew he wasn't entitled to the money and property he

20   asked for?  They haven't shown us that.

21   Reputation.  Again, it's a different world, different

22   rules.  Mr. Burns lives in a glass house, wants to keep his

23   secrets.  He lives in a glass house literally and figuratively,

24   but claims he was scared of being exposed.  Claims -- and the

25   Government told you just now, claims he was afraid that

1   Mr. Brank would expose that he paid for sex.  Let's just be

2   real about it.  Mr. Burns did not act in any way as if he was

3   scared about anyone finding out that he paid for sex.  It was

4   the worst kept secret in the world.

5       He even said, look, it's not a secret.  He had a taste for

6   young men.  He's been pretty open about that.  You've seen the

7   evidence, not something he tried to keep secret.  He's not

8   scared to be associated with the porn stars.  You saw the

9   evidence about that.  You heard the evidence about that.

10  Mr. Burns is open about that.  He's not hiding that in any way.

11  Do you really think he's scared that people are going to say,

12  well, Donald Burns is hanging out with these porn stars.  He's

13  old enough to be their dad.  What's going on there?

14      Look, some of you may have been born at night, but I don't

15  think any of you were born last night.  It is not in any way

16  consistent with the evidence to argue that Mr. Burns was scared

17  about his reputation that people might find out that he was

18  paying for sex.

19      Let's talk about that glass house.  You heard he wanted to

20  arrange a pornography shoot in his glass house.  The Sean Cody

21  people said, hey, this glass house, too much glass.  Not enough

22  privacy.  So we can't do it here.  You heard from the Sean Cody

23  people Mr. Burns said, hey, this would be cool.  This would be

24  something I could brag about to my friends.  Okay.  So we could

25  say, well, look, that's different.  That's about having a

1    pornography shoot, watching a pornography shoot.  It's not

2    paying for sex.  There's a difference.  It's totally different.

3    Okay.

4         Sean Cody people also told you, well, sometimes we had

5    problems caused by Mr. Burns because our actors were supposed

6    to be on set but we found out they were working for Mr. Burns.

7    Mr. Burns had hired them for the weekend, hired them, flew them

8    out to wherever, Nantucket or Palm Beach or whatever it was.

9    The Sean Cody people knew that.  It wasn't a secret that

10   Mr. Burns had engaged their workers, their stars, their porn

11   stars.  They couldn't be on set because they were getting paid

12   elsewhere, maybe a better deal, to work for Mr. Burns to do

13   overnight work.

14        Mr. Burns is worried that the cat is going to come out of

15   the bag.  There are many, many, many cats out of the bag

16   running around.  It's the worst kept secret.

17        He travels with Amadon.  He introduces Amadon to the

18   American ambassador to France.  He introduces him to people

19   running for Congress.  He has pictures taken with him.

20   Mr. Burns told us how the internet works, computers talk to

21   computers, things goes viral.  Anyone can write anything.  It

22   will spread.  You saw those photos.  He told you there are

23   articles that are being published.

24        Mr. Burns told you how easy it is to find people on

25   Facebook.  Apparently that's what Mr. Burns does.  He finds

1      people that he wants to put on his list, his sexual shopping

2      list.  He finds them on Facebook, tracks them down, sifts

3      through, says he can go to the Sean Cody owner's Facebook page,

4      and then he can find the real identities of the stage names of

5      these people.  Mr. Burns knows all about that.

6           He's really saying he's worried when he's traveling around

7      with Mr. Amadon who he introduces to his friends as a porn

8      star.  His friends understand that Mr. Amadon is getting

9      benefits, is benefiting by being Mr. Burns' traveling

10     companion?  Again -- and in no way to disparage Mr. Burns, but

11     he's 52 years old hanging out with these young fit beautiful

12     men, porn stars, taking them around the world.  And he wants us

13     to believe -- he wants you to believe that he was terrified,

14     terrified, shaking, unable to type on his iPhone that someone

15     might find out, that people might find out that he was paying

16     for sex.  Does that make any sense?

17          Mr. Burns was putting himself out there.  You saw the

18     e-mails.  He's out there recruiting.  He's tracking down people

19     to put on his list.  He's making a wish list, making a list,

20     checking it twice.  Found these people on Facebook, contacted

21     people he did not know, got their phone number from other

22     people, contacted them, and say, hey, I've got a proposal for

23     you.  I don't know if he sent the emojis that Justin Griggs

24     talked about.

25          And some of these people you saw, they said, wait, wait a

1    sec, that sounds illegal.  Did that stop Mr. Burns?  No.  Puts

2    that person back on the list and says, hey, Teo, this guy,

3    contacted him.  Said, no, thanks, sounds illegal, see you

4    later.  Mr. Burns didn't let it go.  He's going to get what he

5    wants.

6        He made no attempt to hide his identity.  He's contacting

7    these people.  He's not using an alias.  He's not pretending to

8    be someone else.  He's not hiding his identity at all.  He's

9    contacting them putting himself out there.  There's no

10   agreement, no understanding of confidentiality, and proposing

11   to these people, "Hey, I'm going to pay you for sex.  What do

12   you think?"  Some said yes; some said no way.  Mr. Burns is not

13   hiding the fact he's reaching out for people to pay for sex.

14   Not at all.

15       Obviously, also, different rules apply.  Not worried at

16   all that someone is going to say, hey, wait, that's illegal.

17   I'm reporting you.  Mr. Burns does not have those concerns.

18   You saw him he testify.  Did you see him concerned?

19       He flies out -- you heard about how he arranges his group

20   sex parties.  Some people call them orgies.  He puts multiple

21   young men on a plane.  Justin Griggs told you he got on a plane

22   to go to Mr. Burns' special house on the island.  Mr. Burns

23   knows all about young people and social media.  That's how he

24   finds them.  You heard there's no confidentiality agreement.

25   There's no understanding like keep your mouth shut.  None of

1  that came up with Justin Griggs until this case started.

2      So Mr. Griggs {sic} is flying out 20 somethings, 30

3  somethings.  We know about that.  We know about 20 somethings

4  and 30 somethings and social media.  They take pictures of what

5  they eat for lunch.  They tweet "I'm going to take a nap now."

6  Tweet a couple minutes later "woke up from my nap."  That's

7  what people do on social media.  And Mr. Burns has no agreement

8  with them about, hey, wait, nothing -- ixnay on the Instagram

9  about the Nantucket trip.  Ixnay on the Snapchats from our

10 special weekend in Palm Beach.  None of that.

11     Mr. Burns is not trying to hide anything.  He's not

12 worried.  Did he look worried up there to you?  That Mr. Burns

13 is paying for sex is the worst kept secret in the world.  He's

14 not worried.  Different rules apply to someone like Mr. Burns.

15 Nothing bad is going to happen out of this to Mr. Burns.  You

16 be the judge.  You saw him up there.

17     And with the recruiting, Mr. Burns is not just trying to

18 recruit.  He wants to spread the word, spread the word, guys.

19 Here's a referral fee.  Spread the word.  Bring in more people.

20 Introduce them to me.  Let them know about my pay-for-sex

21 transactions that I'm offering.  It's a good time.

22     Okay.  You saw Mr. Burns on the stand.  He said -- he said

23 the words.  He said he was embarrassed, he was ashamed, he

24 feared for his reputation.  You saw him testify.  You're the

25 jury.  You get to decide what you believe about what Mr. Burns

1    said.  You know actions speak louder than words.  You heard

2    about his actions.  You heard his words here over two days, and

3    it really was a tail of two days of testimony, wasn't it?

4        The first day Mr. Burns comes in here smooth as silk.

5    Matter of fact.  Just tells you straight up, yeah, paid for

6    sex.  Flew the people out for sex, had the group sex parties.

7    That's what I did.  And he was a great witness.  He was perfect

8    and polished and trained.  He was polite.  He kept track of how

9    many times the prosecutor asked him a certain question.  "You

10   asked me that three times."  He would after the question wait,

11   pause, turn to you, make eye contact with some of you because

12   Mr. Burns hires people to help him.  He was a great witness.

13   He was perfectly trained.  But did he seem embarrassed?  Did he

14   seem ashamed?  Did he seem embarrassed to be talking about it?

15   Did he seem worried that anything was going to happen to him?

16   Different rules.

17       Now, something happened between the first day and the

18   second day.  The second day he's asked the same question again

19   for the third or fourth time, "What were you worried?  About

20   what was the harm?"  And then tears.  Maybe the decision was

21   with Mr. Burns' team.  Maybe the decision was, hey, look,

22   you're supposed to convince them that you were worried, really,

23   really, really worried, terrified, shaking that someone was

24   going to expose that you were paying for sex.  Let's try

25   something different.

1          MS. JAIMEZ:  Objection, Your Honor.  Lacks

2     foundation.  Misstates testimony.

3          THE COURT:  Objection is overruled.

4          MR. CHOWDHURY:  Different rules apply to someone

5     like Burns.  The Government is going to tell you use your

6     common sense.  Use your common sense.  This is not a

7     complicated issue.  This is not a complicated case.  The

8     Government wants to come in here, present slide after slide

9     about how Mr. Burns was so terrified for his reputation, so

10    terrified, shaking in fear that the world would find out that

11    he was paying for sex.  Use your common sense.  You don't need

12    a law degree to do that.  It's pretty simple.

13         Okay.  So some of you, I'm sure, are looking at me like,

14    come on, what are you talking about?  What about these bad

15    facts?  Look, we heard about a million dollars.  What are you

16    going to say about that?  We heard about the million dollars.

17    We saw those scary grainy photos.  He's wearing a hoodie.  What

18    about that?  We heard about some gun.  What about that?  We

19    read these text messages.  What are you going to say about

20    that?  And that tweet, the warning tweet, what are you going to

21    say about that?  Let's talk about it.

22         The million dollars, seems like a lot of money to us.

23    Seems unimaginable.  Million dollars.  Do you know what else is

24    unimaginable?  Unimaginable?  Selling a company for

25    $1.1 billion, being worth $138 million, having houses all over

1    the country, flying around in private jets.  Not just owning a

2    yacht, owning the company that makes yachts.  Too much.  It's

3    too much we're told by Mr. Burns.  That's too much.  Mr. Brank

4    wasn't worth that.

5        We don't know that for two reasons, two reasons.  First,

6    it's just Don Burns telling us that.  No one came in here.  The

7    Government made no attempt to establish what's the fair market

8    value of everything that Mr. Brank did for Mr. Burns?  What

9    could he expect in the promises that Mr. Burns had made to him?

10   There's nowhere to check.  There's no expert.  There's no

11   market.  We weren't shown any of that.  We don't know.  I would

12   submit we don't know because the Government hasn't shown us

13   what the value of everything that Mr. Brank did for Mr. Burns,

14   what that was.

15       They're going to try to break it down and say each sexual

16   transaction was worth that much and also there was an

17   established referral fee for each time he would bring him a new

18   man.  There would be a referral fee and maybe a tip.  But we

19   saw -- and we saw the evidence.  You saw Amadon.  You saw

20   Griggs.  You know that it's not simply a business transaction.

21       Again, what's the second reason why we don't know that the

22   amount that Mr. Brank asked for was too much?  We've got that

23   sliver on the phone, two weeks out of two years.  We didn't

24   hear because Mr. Burns didn't want you to, didn't want the FBI

25   to, didn't want the prosecutors to, and now didn't want you to

1    see the rest of the story, what other promises were made, what

2    other understandings they had.  That conversation that the

3    prosecutors have read to you, that Mr. Burns has read to you,

4    you know that's a conversation that's in midstream.  You know

5    that there's more to that.

6        The scary grainy photos.  Mr. Burns put on a performance

7    for you.  The prosecution is putting on a performance for you.

8    They're showing you the scary grainy photos.  You heard from

9    Agent Sterle.  He was the first witness.  He got up there.  He

10   said, that Starbucks parking lot, that's my favorite parking

11   lot.  All sorts of crazy stuff goes down there.  We took down

12   these really dangerous people there.

13       And they show you these pictures of Mr. Brank.  You can

14   imagine going through the grainy pictures, yes, and this one he

15   looks like a zombie.  He's got a hood on.  He's really scary,

16   and he's out there, and he's walking around in the parking lot.

17   What did Mr. Brank come armed to that meeting with at the

18   Starbucks?  A pen.  We saw the video -- I don't know how long

19   it went on -- of him sitting there with Agent Sterle saying,

20   "Do I sign on this document?  Will the DMV -- do you want me to

21   sign here?  Do I put my full name here?  Am I owner?  The

22   buyer?"  Maybe he came armed with a pen because you heard from

23   the agents he certainly didn't have a gun.  They arrested him.

24   They checked him.  They patted him down.  No backpack.  No gun.

25       So I'm not really sure what the scary picture is about.  I

1    guess they want you to think, well, look, he was hiding.  He

2    sat down awkwardly.  I guess file that in your evidence bin.

3    He sat down awkwardly.  The picture itself at the end of the

4    day, we got nothing out of that.  We didn't get the gun.

5         Let's talk about the gun for a second.  It's a red

6    herring.  There's no gun charge here.  Mr. Yim didn't have a

7    gun charge.  This is not a gun case.  It's an extortion case,

8    and the Government wants you to fixate on the gun.  The

9    evidence we heard that this gun -- Mr. Yim got it from his

10   friend.  It was unloaded.  Mr. Yim himself was not charged with

11   a gun charge.

12        And just a word about Mr. Yim.  Mr. Yim has pled guilty.

13   He's cooperating with the Government.  He told you.  The

14   Government wants you to believe this person who has pled

15   guilty, who is guilty of a crime, who was convicted.  Mr. Brank

16   is not guilty of anything.

17        The text messages, as we said, we got those midstream.

18   You know that you only got two weeks out of two years.  There

19   was more to that relationship.  And if you look at the words,

20   you can tell the Government is twisting some of those words.

21   You can tell Mr. Brank's e-mails, sometimes the grammar doesn't

22   make sense, et cetera.  Look at them.  You can tell they're

23   being twisted.

24        Finally, the tweet.  "How many porn stars know a man named

25   Don?"  We've talked about that.  That is not a threat to

1    Mr. Burns.  "How many porn stars know a man named Don?"  Don is

2    out there with porn stars.  He's flying them around.  He's

3    contacting them.  You saw the photos.  They're in evidence.

4    Mr. Burns was open about that.  The tweet was directed to other

5    porn stars, asked, "How many porn stars know Don?"  There's no

6    threat there to Mr. Burns, nothing that isn't already out

7    there.

8         The Court is going to give you the instructions.  As I've

9    suggested, I ask you to focus on two of the instructions in

10   particular.  The fear of reputational harm.  Consider what

11   we've talked about.  Do you believe the Government has shown

12   beyond a reasonable doubt that there was any fear that

13   Mr. Burns had about his reputation?  Was it reasonable for

14   anyone, given this context, to fear for his reputation?

15        And the second point, the Government will have to show on

16   the extortion counts, Counts 1, 2, and 5, that Mr. Brank knew

17   he was not entitled to what he asked for, he had no legitimate

18   claim to it.  We talked about that.  Ask yourself if you know

19   what the actual value of what Mr. Brank did for Mr. Burns and

20   what was promised to Mr. Brank in exchange.

21        Counts 1, 2, and 5 are the extortion counts.  The

22   Government, I don't think, will disagree on their slides.  They

23   put up the incorrect law on Count 6, and I think they'll

24   correct that.  But if Counts 1, 2, and 5, if Mr. Brank is not

25   guilty on Counts 1, 2, and 5, it follows.  He's not guilty on

52

1    the other count.  You can look at the instructions.  If the

2    Government disagrees with me, they'll tell me when they stand

3    up.

4         Now, from the beginning of this case, since you've been

5    sworn in as jurors, you've taken an oath.  You've taken an oath

6    to uphold several very important points.  The burden of

7    proof -- the burden of proof is on the Government.  The burden

8    of proof is on the Government to prove every element of these

9    crimes beyond a reasonable doubt.

10        Presumption of innocence.  You saw -- we saw slide after

11   slide of these six charges.  As the Court has told you, the

12   charges are not evidence.  You'll get an Indictment.  It's not

13   evidence.  There's been no finding of guilt of Mr. Brank.

14   That's your job to determine whether he's guilty or not guilty.

15   The Government can bring whatever charges they want to bring.

16   It doesn't mean anything about Mr. Brank's guilt.

17        It's a simple case.  You can ask yourself why are we

18   getting this long thick stack of charges?  The presumption of

19   innocence has been with Mr. Brank since the beginning.  It's a

20   cloak that he's wrapped in.  He remains presumed innocent up

21   until the time that the Government proves its case against him

22   on these charges beyond a reasonable doubt.  Up until that

23   point he's presumed innocent, as we all are.  And that is

24   something we're protected under our Constitution in the event

25   that any of us are accused wrongly of a crime, perhaps someone

```
1    like Mr. Burns comes in and accuses someone of a crime, accuses
2    Mr. Brank of a crime.  Mr. Burns wants to paint a picture of
3    Mr. Brank, but he's presumed innocent until you -- until the
4    Government proves his guilt beyond a reasonable doubt.
5         What is beyond a reasonable doubt?  It's the highest
6    standard we have in the law.  It's the kind of standard you
7    would want to apply if you're making the most important
8    decisions in your life.  You want to be as certain as you can
9    be.  The Government is right.  You can never eliminate all
10   doubt.  Nothing in life has no doubt.  That's impossible.  But
11   we create the highest standard because what we're doing here is
12   final for Mr. Brank.  You have his fate in your hands.  His
13   life is in your hands.  What happens here changes his life.
14   It's permanent.  That's why we have a beyond a reasonable doubt
15   standard.
16        It's a standard you would use in making the most important
17   decisions in your life.  If you have a child that needs
18   surgery, if you have a loved one wanting to take off life
19   support, before you do that, you want to be as certain as you
20   can be.  You can never eliminate all doubt, but you want to be
21   as certain as you can be, and that's what the law -- that's
22   what your duty is, the oath you've taken.  Unless the
23   Government proves all of these elements beyond a reasonable
24   doubt, the Court will tell you you must find Mr. Brank not
25   guilty.  That's the law.  That's the Constitution.  That's what
```

```
 1    the judge will tell you to do in following your oath as jurors.
 2        Finally, sometimes there can be this feeling like let's
 3    get out of here.  I understand that.  Let's beat traffic.
 4    Let's get home.  Let's be done with this.  What's the point?
 5    Let's just get to a decision.  What you're doing is you have --
 6    you've been invested with great power here.  You decide -- no
 7    one can decide.  The judge is not going to be in that room with
 8    you.  The prosecutor is not going to be in that room with you.
 9    I'm not going to be in that room with you.  You will be in that
10    room alone with Mr. Brank's fate in your hands, and it's final
11    what you decide.
12        If you decide this weekend you're brushing your teeth and
13    you're like, hey, wait a sec, maybe Mr. Brank -- he could have
14    been entitled to that, you can't call Judge Walter and say,
15    Judge, I want to take my vote back.  If you decide next week,
16    maybe Mr. Burns didn't fear for his reputation.  You can't call
17    the prosecutor and me and say I want to take my vote back.
18    This is final.
19        So I would ask you, I would urge you to, I would beg you
20    to take your time.  Go through the evidence, discuss it fully.
21    And if you find maybe you're in the minority, maybe you don't
22    agree with the rest of the group, to hold on to your
23    convictions, your viewpoint.  Discuss it with the group.  If
24    they convince you with others, if they show you why the
25    evidence shows perhaps they're right and you're wrong, that's
```

1     what deliberations are for.  But don't join a group just to
2     join.
3           What you're doing back there is something protected by the
4     Constitution, and this is something that we fight for.  They
5     don't have this all over the world.  What you're doing here is
6     special.  I just want you to go in there knowing that.
7           So I'm going to sit down in a second.  It's my last chance
8     to speak to you, the last chance defense has to speak with you.
9     That's the rules.  The Government is going to get up.  They're
10    going to respond.  They're going to try to respond.  They're
11    going to respond to what I said.  I'm not going to be able to
12    say anything after that, and I would just ask you, as you're
13    listening to them, to keep in mind, think about what would the
14    defense say in response?  What questions would they ask?  Has
15    the prosecution answered our questions?
16          This case is about three things -- relationships,
17    reputation, and rules, and different rules that apply to
18    someone like Mr. Burns.  I think the evidence points in only
19    one direction.  Mr. Brank is not guilty.
20              THE COURT:  All right.  Thank you very much.
21          Government.
22              MS. JAIMEZ:  Thank you, Your Honor.
23          "How do I know you won't report me for extortion?"  "Who
24    wants to be friends with blackmail?"  "What if the feds show up
25    and I'm fucked?"  "Shoot if someone starts shooting."  "I can

1    bring your house down, Don."

2         This is a case about extortion.  This is not a case about

3    prostitution or relationships.  Actions do speak louder than

4    words as defense counsel has said, and the defendant's actions

5    speak volumes.

6         He texted threats in interstate commerce.  He texted the

7    words "extortion," "blackmail."  He said he would bring the

8    tweet down if, only if, he was paid.  He posted on Twitter.  He

9    said that he would only take it down if he had both hands full

10   of cash.  That's what he indicated.  Then after he got his

11   money and the Audi r8, which he was so fond of, he demanded

12   more money.  And when he went to go pick up that money, he got

13   a gun and said to shoot if people start shooting.  Actions do

14   speak louder than words.

15        The defendant's actions show that he knew he was not

16   entitled to this property.  Why would he have to bring a gun if

17   he was entitled to $1 million, $500,000, an Audi r8?  Why would

18   you need a gun?

19        Now, the defense says that Donald Burns had the worst kept

20   secret, the cat was out of the bag, but the defense has

21   misconstrued what the secret was.  The secret was not that

22   Donald Burns associated with good looking young men or that

23   Donald Burns associated with pornography actors.  He was a

24   wealthy man.  Wealthy men associate with good looking younger

25   people sometimes.

```
 1          The secret was that he was engaged in prostitution.  The
 2   secret was that he was paying people for group sex every three
 3   to six weeks.  That's criminal activity, and he did not want
 4   that out there because it would affect his business reputation.
 5   It would affect his reputation in the community.  It would
 6   affect his interpersonal reputations, and it would be
 7   incredibly embarrassing notwithstanding the criminal liability.
 8   That was the secret he wanted to keep from getting out.
 9          And the defense has not offered any evidence that that was
10   a well --
11              MR. CHOWDHURY:  Objection.  Burden shifting,
12   Your Honor.
13              THE COURT:  The objection is overruled.
14              MS. JAIMEZ:  There is no contrary evidence to this
15   fact.  There is no evidence that the public knew that
16   Donald Burns was engaged in pay-for-sex activity.  Absolutely
17   none.  To the contrary, Donald Burns said on the stand that he
18   didn't tell people that.  He didn't even tell many people that
19   Mackinzie Amadon, his good friend, had been a pornography actor
20   at some point.  Only a close group of friends knew that part.
21   He didn't go around telling people he was engaged in
22   prostitution.  Who would?
23          This is not a case about prostitution.  Donald Burns
24   admitted to those acts, and he told you he has not been offered
25   immunity.  He could suffer consequences, but that's not an
```

issue for you to consider.  The only issues for you to consider
today are charges 1 through 6 dealing with extortion and the
defendant's conduct, and the defendant's conduct and his words
are clear.

     Now, the defense has mentioned that Donald Burns is
wealthy and that he had attorneys and private investigators.
This is true.  This is what made him the perfect target for
extortion.  He was a wealthy man with terrible secrets.  That's
the person you want to extort.  Not your next door neighbor who
goes to church every Sunday who doesn't have much money.
That's not a wealthy venture there.  You want to extort the
person with money and secrets, and that's what the defendant
did here using a telephone in connection with his extortion.

     And, yes, with respect to Count 6, you are going to want
to consider did he use a facility of interstate commerce in
connection with extortion as defined in the counts, not under
California state law.

     Now, the defense also talked at length about what the fair
market value of the defendant's services was and said that the
Government hadn't proven, hadn't offered expert testimony about
what the fair market value of pimping is.  There is no fair
market value for pimping.  All we know is what Donald Burns
paid.  He paid people $2,000 for referral fees, and he paid
them $2,000 for sexual contact.  Griggs corroborated that.
That's all you need to know about that point.  And, in fact,

```
 1    it's not even relevant to these charges because, again, this
 2    case is not about prostitution.  It's about extortion, and the
 3    defendant himself says "extortion," "blackmail" in his text
 4    messages.
 5         The defense also talks about the limited search of
 6    Donald Burns' phone over and over again.  Remember, we also
 7    searched the Government -- the Government also searched the
 8    defendant's cell phone, got a search warrant, searched the
 9    entire cell phone.  There was not one shred of evidence of any
10    type of agreement between Donald Burns and the defendant to the
11    tune of $1 million or $500,000 or an Audi r8.  No indication
12    that Donald Burns ever made such promises to the defendant.
13         But the FBI went beyond just extracting the defendant's
14    phone.  Agent Bouman testified that they did additional
15    investigation.  They sent subpoenas.  They extracted other
16    phones.  They had witness interviews.  All of it corroborated
17    extortion.  Not one piece of evidence about some promise or
18    some agreement that never was between the defendant and
19    Donald Burns.
20         The only agreement they had was a pay-for-sex agreement
21    where sometimes the defendant would have sex with Donald Burns
22    for $2,000 or thereabouts and sometimes he would refer people
23    for sex.  One time it didn't work out and defendant kept the
24    $2,000 referral fee.  So it's the defendant who in fact owes
25    Donald Burns if we want to be technical.  There's no evidence
```

```
1    that Donald Burns ever owed defendant for anything.

2         Defense mentions one time that Donald Burns had sexual

3    contact with the defendant without paying.  Surely, surely that

4    sexual contact was not worth $1.5 million and an Audi r8.

5    Surely.  That cannot be the argument.

6         The defense says there's more to the story.  The

7    Government has investigated it thoroughly.  There was no

8    evidence of any other story.  Defendant wanted the car.  He got

9    the car by extorting Donald Burns.  Defendant wanted both hands

10   full of cash.  He got the $500,000 by threatening to expose

11   this pay-for-sex arrangement.

12        Defense says the gun is a red herring.  The gun evidence

13   is his intent, his state of mind.  Remember, we can't look into

14   the defendant's mind and know what he's thinking.  We have to

15   look at his actions.  We have to look at his words.  His words

16   said extortion.  His words said blackmail.  His actions said

17   get a gun and start shooting if someone shoots.

18        The defense also mentioned Mackinzie Amadon.  Donald Burns

19   talked about Mackinzie Amadon at length.  It's a relationship.

20   That is a relationship.  That is a relationship that grew from

21   a pay-for-sex meeting, and there is financial support on a

22   monthly basis.  And the aggregate amount of that financial

23   support, what was it?  $200,000.  Nowhere near $1.5 million and

24   an Audi r8 valued at $180,000, and it was provided on a monthly

25   basis, and it was provided in the context of a true
```

1    relationship.  And there was no agreement.  There was no

2    promise.  There was no demand from Mackinzie.  Mackinzie never

3    said give me this support; otherwise, I will expose you for

4    what you are.  There's no evidence to that.  Quite to the

5    contrary.

6         The defense says over and over again that there must have

7    been something more, must have been something more.  The

8    defendant feeling entitled does not mean he has a right to

9    $1.5 million and an Audi r8 valued at $180,000.  Him feeling

10   like he wanted to be in Mackinzie Amadon's place does not give

11   him a right to that property.

12        Now, the Government has the burden in this case.  That's

13   entirely correct.  We have the burden, and we've met that

14   burden.  We've provided you evidence of the fact that he sent

15   threatening communications in interstate commerce.  He

16   threatened Donald Burns' reputation, and that threat had a

17   probable effect on interstate commerce because of the fact that

18   he's involved in so many different businesses, charitable

19   organizations, and the fact he uses his Goldman Sachs account

20   in New York to wire money.  The Government has met its burden.

21        The Government does not need to disprove prostitution.

22   That is not the question of this case.  The question is whether

23   or not the defendant sent threatening communications with an

24   intent to extort, whether or not the defendant extorted on

25   February 16 and obtained money and a car, whether or not the

1  defendant attempted further extortion on March 3rd to get

2  another $1 million, whether or not he received extortion

3  proceeds.  He did -- an Audi r8, $500,000 wire transfer.  And

4  whether or not he used a phone in connection with this scheme,

5  and he did, his Samsung phone which was extracted and

6  corroborates extortion.

7      The Government asks that you find the defendant guilty on

8  all counts.

9          THE COURT:  All right.  Thank you very much.

10     Before I begin reading the jury instructions, if there's

11 any member that wants to leave now, please do so.

12     All right.  Members of the jury, now that you've heard all

13 the evidence, it's my duty to instruct you on the law that

14 applies to this case.  A copy of these instructions will be

15 available in the jury room for you to consult.  It is your duty

16 to weigh and evaluate all the evidence received in the case and

17 in that process to decide the facts.  It is also your duty to

18 apply the facts as I -- apply the law, as I give it to you, to

19 the facts, as you find them, whether you agree with the law or

20 not.

21     You must decide the case solely on the evidence and the

22 law and must not be influenced by any personal likes or

23 dislikes, opinions, prejudices, or sympathy.  You will recall

24 that you took an oath promising to do so at the beginning of

25 the case.

1    You must follow all of these instructions and not single

2    out some and ignore others.  They are all important.  Please do

3    not read into these instructions or into anything I may have

4    said or done any suggestion as to what your verdict -- what

5    verdict you should return.  That is a matter entirely up to

6    you.

7        Now, as I've indicated at the outset -- and it's still

8    obviously very true -- the Indictment is not evidence.  The

9    defendant has pleaded not guilty to each of the charges.  The

10   defendant is presumed to be innocent unless and until the

11   Government proves the defendant guilty beyond a reasonable

12   doubt.

13       In addition, the defendant does not have to testify or

14   present any evidence to prove innocence.  The Government has

15   the burden of proving every element of the charges beyond a

16   reasonable doubt.

17       Now, proof beyond a reasonable doubt is proof that leaves

18   you firmly convinced the defendant is guilty.  It is not

19   required that the Government prove guilt beyond all possible

20   doubt.  A reasonable doubt is a doubt based upon reason and

21   common sense and is not based purely on speculation.  It may

22   arise from a careful and impartial consideration of all the

23   evidence or from the lack of evidence.

24       If after a careful and impartial consideration of all the

25   evidence you are not convinced beyond a reasonable doubt that

1   the defendant is guilty, it is your duty to find the defendant

2   not guilty.  On the other hand, if after a careful and

3   impartial consideration of all the evidence you are convinced

4   beyond a reasonable doubt that the defendant is guilty, it is

5   your duty to find the defendant guilty.

6        Now, a defendant in a criminal case has a constitutional

7   right not to testify.  You may not draw any inference of any

8   kind from the fact that the defendant did not testify.

9        A separate crime is charged against the defendant in each

10  count.  You must decide each count separately.  Your verdict on

11  one count should not control your verdict on any other count.

12       Now, the evidence that you're to consider in deciding what

13  the facts are consist of the sworn testimony of any witness,

14  the exhibits received into evidence, and any facts to which the

15  parties have agreed or stipulated to.  The following things are

16  not evidence, and you may not consider them in deciding what

17  the facts are:  Questions, statements, objections and arguments

18  by the lawyers are not evidence.  The lawyers are not

19  witnesses.  Although you must consider a lawyer's question to

20  understand the answers of a witness, the lawyer's questions are

21  not evidence.  Similarly, what the lawyers have said in their

22  opening statements, closing arguments, and at other times is

23  intended to help you interpret the evidence, but it is not

24  evidence.  If the facts as you remember them differ from the

25  way the lawyers state them, your memory of them controls.

1    Any testimony that I have excluded or stricken or
2  instructed you to disregard is not evidence.  In addition, some
3  evidence was received only for a limited purpose.  When I've
4  instructed you to consider certain evidence in a limited way,
5  you must do so.  Also, anything you may have seen or heard when
6  the Court is not in session is not evidence.  You are to decide
7  this case solely on the evidence received during this trial.

8    Now, evidence may be direct or circumstantial.  Direct
9  evidence is proof of a direct fact such as testimony by a
10  witness about what that witness personally saw or heard or did.
11  Circumstantial evidence is indirect evidence, that is, proof of
12  one or more facts from which you can find another fact.

13    You are to consider both direct and circumstantial
14  evidence.  Either can be used to prove any fact.  The law makes
15  no distinction between the weight to be given to either direct
16  or circumstantial evidence.  It is for you to decide how much
17  weight to give any evidence.

18    In deciding the facts in this case, you may have to decide
19  which testimony to believe and which testimony not to believe.
20  You may believe everything a witness says or part of it or none
21  of it.

22    In considering the testimony of any witness, you may take
23  into account the following: The witness' opportunity and
24  ability to see or hear or know the things testified to; the
25  witness' memory; the witness' manner while testifying; the

1    witness' interests in the outcome of the case, if any; the

2    witness' bias or prejudice, if any; whether other evidence

3    contradicted the witness' testimony; the reasonableness of the

4    witness' testimony in light of all of the evidence; and any

5    other factors that bear on believability.

6         The weight of the evidence as to a fact does not

7    necessarily depend on the number of witnesses who testify.

8    What is important is how believable the witnesses were and how

9    much weight you think their testimony deserves.

10        You have heard testimony from undercover agents who were

11   involved in the Government's investigation in this case.  Law

12   enforcement officials may engage in stealth and deception such

13   as the use of undercover agents in order to investigate

14   criminal activities.  Undercover agents may use false names and

15   appearances and assume roles of members in criminal

16   organizations.

17        The parties have agreed to certain facts that have been

18   stated to you.  As I indicated during the course of the trial,

19   you should treat these facts as having been proved.

20        Now, the defendant is charged in Count 1 of the Indictment

21   with transmitting threatening communications with intent to

22   extort in violation of Section 875(d) of Title 18 of the

23   United States Code.  In order for the defendant to be found

24   guilty of that charge, the Government must prove each of the

25   following elements beyond a reasonable doubt:

First, defendant knowingly transmitted in interstate or foreign commerce a communication containing a wrongful and true threat to injure the reputation of another, in this case Donald Burns;

Second, the defendant did so with the intent to extort money or something else of value from Donald Burns.

In determining whether a communication is a true threat, you must find that it meets both an objective and a subjective standard.  As to the objective standard, a true threat is one that would be understood by reasonable people hearing or reading it in the context -- in context as a serious expression of an intent to injure the reputation of another, in this case, Donald Burns.

As to the subjective standard, a true threat is one that the defendant subjectively intended to be understood as a threat.

Intent to extort means to act with the purpose of obtaining money or something else of value from another with his consent by a wrongful threat to injure the reputation of another, in this case, Donald Burns.

To transmit a communication in interstate commerce means to send it from place -- from a place in one state to a place in another state.  To transmit a communication in foreign commerce means to transmit it from a place in the United States to any place outside the United States.

1    The defendant is charged in Count 2 of the Indictment with

2    extortion by nonviolent threat in violation of Section 1951(a)

3    of Title 18 of the United States Code.  In order for the

4    defendant to be found guilty of that charge, the Government

5    must prove each of the following elements beyond a reasonable

6    doubt:

7    First, the defendant induced Donald Burns to part with

8    property by wrongful use of fear, specifically by wrongful

9    threat of reputational harm;

10   Second, the defendant acted with the intent to obtain

11   property;

12   And, third, commerce from one state to another was

13   affected in some way.

14   The defendant is charged in Count 3 and 4 of the

15   Indictment with receiving proceeds, property of extortion in

16   violation of Section 880 of Title 18 of the United States Code.

17   In order for the defendant to be found guilty of these charges,

18   the Government must prove each of the following elements beyond

19   a reasonable doubt:

20   First, defendant received, possessed, concealed, or

21   disposed of any money or property or other property;

22   Second, the property was obtained from the commission of

23   the offense charged in Count 1, namely, transmitting

24   threatening communications with the intent to extort;

25   Third, the defendant knew that the money or other property

1    had been unlawfully obtained.

2         Now, the defendant is charged in Count 5 of the Indictment

3    with attempted extortion by nonviolent threat in violation of

4    Section 1951(a).  In order for the defendant to be found guilty

5    of that charge, the Government must prove each of the following

6    elements beyond a reasonable doubt:

7         First, the defendant intended to induce Donald Burns to

8    part with property by the wrongful use of fear, specifically by

9    wrongful threat of reputational harm;

10        Second, the defendant acted with the intent to obtain

11   property;

12        Third, commerce from one state to another state would have

13   been affected in some way;

14        Fourth, the defendant did something that was a substantial

15   step toward committing the crime.  Mere preparation is not a

16   substantial step toward committing the crime.  To constitute a

17   substantial step, a defendant's act or actions must demonstrate

18   that the crime will take place unless interrupted by

19   independent circumstances.

20        For purposes of Count 1, Count 2, and Count 5, a threat is

21   wrongful if the defendant knew that he was not entitled to the

22   property or that the threat had no nexus, that is, a connection

23   to a legitimate claim for money or property.

24        Counts 2 and 5 have an element that commerce from one

25   state to another was or would have been affected in some way.

The term "commerce" means all commerce between any point and a
state territory possession or the District of Columbia or any
point outside thereof and all commerce between points within
the same state through any place outside the state.

As for the word "affect," only a minimal effect on
commerce is required.  The effect need only be reasonably
probable, not actual.

Now, the defendant is also charged in Count 6 of the
Indictment with violating Section 1952(a)(3) of Title 18.  In
order for the defendant to be found guilty of that charge, the
Government must prove each of the following elements beyond a
reasonable doubt:

First, the defendant used a facility of interstate or
foreign commerce, namely, a cellular telephone, with the intent
to promote, manage, establish, or carry on or facilitate the
promotion, management, establishment, or carrying on of an
unlawful activity, namely, extortion offenses in violation of
the laws of the United States;

Second, after doing so, the defendant attempted to perform
acts to promote, manage, establish, carry on, or facilitate the
promotion, management, establishment and carrying on of the
extortion;

And, third, the defendant did something that was a
substantial step toward committing the crime.  Mere preparation
is not a substantial step toward committing the crime.  To

constitute a substantial step, a defendant's act or actions must demonstrate that the crime will take place unless interrupted by independent circumstances.

Now, an act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident.  You may consider evidence that the defendant's words, acts or omissions along with all of the other evidence in deciding whether the defendant acted knowingly.

The intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there's no way of directly scrutinizing the workings of the human mind.  In determining the issue of what the defendant knew or what the defendant intended at a particular time, you may consider any statement made or acts done or omitted by the defendant and all other facts and circumstances received in evidence which may aid in your determination of the defendant's knowledge or intent.

The Indictment charges that offenses -- the offenses alleged were committed on or about certain dates.  Although it is necessary for the Government to prove beyond a reasonable doubt that the offenses were committed on the date reasonably near the dates alleged in the Indictment, it is not necessary for the Government to prove that the offenses were committed precisely on the dates charged.

Now, when you begin your deliberations, you will elect one

1    member of your jury as foreperson who will preside over the

2    deliberations and speak for you here in court.  You will then

3    discuss the case with your fellow jurors to reach an agreement

4    if you can do so.

5         Your verdict, whether guilty or not guilty, must be

6    unanimous.  Each of you must decide the case for yourself, but

7    you should do so only after you have considered all of the

8    evidence, discussed it fully with the other jurors, and

9    listened to the views of your fellow jurors.  Do not be afraid

10   to change your opinion if the discussion persuades you that you

11   should, but do not come to a decision simply because other

12   jurors think it is right.

13        It is important that you attempt to reach a unanimous

14   verdict but of course only if each of you can do so after

15   having made your own conscientious decision.  Do not change an

16   honest belief about the weight and effect of the evidence

17   simply to reach a verdict.

18        Now, some of you may have taken notes during the trial.

19   Whether or not you took notes, you should rely on your own

20   memory of what was said.  Notes are only to assist your memory,

21   and you should not be overly influenced by your notes or those

22   of your fellow jurors.

23        The punishment by law for these crimes is for the Court to

24   decide.  You may not consider punishment in deciding whether

25   the Government has proved its case against the defendant beyond

1    a reasonable doubt.

2         Now, we have prepared a verdict form for you.  After you

3    have reached a unanimous agreement on a verdict, your

4    foreperson should complete the verdict form according to your

5    deliberations, sign the form, date it, and advise the clerk

6    that you're ready to return to the courtroom.

7         If it becomes necessary during your deliberations to

8    communicate with me, you may send a note through the clerk

9    signed by one or more of you.  No member of the jury should

10   ever attempt to communicate with me except by a signed writing,

11   and I will respond to the jury concerning the case only in

12   writing or here in open court.  If you send out a question, I

13   will consult with the lawyers before answering it which may

14   take some time.  You may continue your deliberations while

15   waiting for the answer to any question.

16        Remember that you're not to tell anyone, including me, how

17   the jury stands numerically or otherwise on any question

18   submitted to you including the question of the guilt of the

19   defendant until you have reached a unanimous verdict or have

20   been discharged.

21        The Court does not have any additional instructions.  I

22   will ask the bailiff to come forward, and we'll swear the

23   bailiff.

24             THE CLERK:  Please state your appearance for the

25   record.

```
 1            THE BAILIFF:  John Salas, S-a-l-a-s.

 2            THE CLERK:  Please raise your right hand.

 3        (Bailiff sworn.)

 4            THE COURT:  All right.  Ladies and gentlemen, I'm

 5   going to excuse you in just a minute to begin your

 6   deliberations, but I have a couple of other comments.

 7            The first is unfortunately the alternates can't

 8   participate in the deliberations in the jury room.  So if you

 9   have anything in the jury room, I'm going to ask you to go

10   back -- Shannon will go back with you -- and remove anything

11   you have from the jury room, and go back up to the jury room,

12   and we'll keep you advised of the status the case.

13            I understand that lunch has been ordered.  I don't know

14   what time it's going to be delivered, but Shannon will have

15   that information.

16            There's a very important issue that we need to discuss,

17   and that is, when you're deliberating, you have to all be in

18   the room and deliberating at the same time.  There's no

19   caucuses with two or three members of the jury.  I understand

20   you'll be taking breaks, but if you do take a break, the rest

21   of you must stop discussing or deliberating about the case.

22   I'm going to rely not only on your foreperson but each

23   individual juror to remember that you can only discuss the

24   evidence in this case when you're all together.  So that's a

25   very important housekeeping matter.
```

1          The jury instructions, the verdict form, and the exhibits

2     will all be delivered to the jury room.  The exhibits may take

3     a couple minutes, but we'll have them in.  The jury

4     instructions and the verdict form will be in immediately.  I

5     think that's all I have.

6          All right.  I will now ask you to go back into the jury

7     room and commence your deliberations.

8          (The following proceedings were held in

9          open court out of the presence of the jury:)

10              THE COURT:  All right.  The jury is not present.

11         Make sure that Shannon has your contact information, and

12    you're not going to go back to your office.  You're going to

13    remain here.

14         And also, Mr. Marshals, you're not going to take the

15    defendant back over to Roybal.  You're going to keep him in

16    this building in the event we get some question.  So Shannon

17    will need to know where you're going to be.  You can use the

18    witness room at the end of the hall.

19              THE MARSHAL:  I'll keep in communication with

20    Shannon, your CRD.

21              THE COURT:  Okay.  I don't want him to go back to

22    Roybal because, if we have a jury question, we're not going to

23    have a 15-minute delay by the time you get him from Roybal back

24    here.  So he's going to be in this building.

25              THE MARSHAL:  Yes, sir.

1          MS. JAIMEZ:  Your Honor, two quick notes about the

2     exhibits, specifically, Exhibits 201, 201-A, 202, and 202-A,

3     the recordings.  In the original exhibit binder the recordings

4     201 and 202, there's disks there, and I believe we should

5     probably take the disks out and just have face sheets there so

6     they can't listen to the audio back in the jury deliberations.

7     And then with respect to 201- and 202-A, these were erroneously

8     submitted into evidence.  These were marked for identification

9     as the transcripts of the --

10          THE COURT:  Counsel, stop.  I've asked you to

11     communicate with Shannon on these issues, and when Shannon gets

12     back, we can take these up because she's been involved in

13     preparing the post-trial exhibit stipulation.  So we'll hold

14     off until she returns so we can have a clear understanding of

15     what you're trying to accomplish.

16          MS. JAIMEZ:  Yes, Your Honor.  Thank you.

17          THE COURT:  Stay at counsel table.  I'll be back as

18     soon as I can find Shannon.

19        (A pause in the proceedings.)

20          THE COURT:  We're back on the record.  Shannon is

21     now present.

22        Shannon advises that she understands what the issue is.

23     Go ahead and state the issue now.

24          MS. JAIMEZ:  The issue is with respect to Exhibits

25     201 --

```
 1              THE COURT:  Wait a minute.  Wait a minute.
 2              MS. JAIMEZ:  Which is an audio recording.
 3              THE COURT:  All right.  201 in my book is a xerox of
 4     a disk.  What's the issue?
 5              MS. JAIMEZ:  Your Honor, I believe in the originals
 6     we placed the actual disk.
 7              THE COURT:  Okay.
 8              MS. JAIMEZ:  It's our understanding that the disk
 9     should just be heard in open court, not back in the jury room.
10              THE COURT:  Right.  So 201 which has the original
11     disk, Shannon, are you going to take the original disk out?
12              THE CLERK:  Yes.  And they want the 201-A.
13              THE COURT:  Do you have one of these, Shannon?
14              THE CLERK:  No.
15              THE COURT:  Okay.  Why don't you -- I'll give you
16     mine.  I didn't write on it.
17          What's the next issue?
18              MS. JAIMEZ:  The next issue is with respect to the
19     transcript for 201.  It's noted at 201-A.  It was initially
20     marked for identification purposes only but erroneously put
21     into evidence.  So we'd like for it to be taken out of
22     evidence.  We've already discussed that with the defense, and
23     they've also asked us to take out the transcript.
24              THE COURT:  Okay.  Exhibit 201 --
25              MS. JAIMEZ:  A.  It's the transcript for the
```

**UNITED STATES DISTRICT COURT**

```
 1   recording.
 2              THE COURT:  201-A.
 3              THE CLERK:  Do you have a photocopy of 202 like you
 4   did 201?
 5              THE COURT:  Hold on.  I'm still on 201-A.
 6         The record will reflect that, pursuant to agreement of
 7   counsel, that 201-A is -- was erroneously received into
 8   evidence and will now be unreceived and will be taken out of
 9   the original exhibit binder; is that correct?
10              MS. AHMAD:  Yes, Your Honor.
11              THE COURT:  Correct?
12              MS. JAIMEZ:  Yes, Your Honor.
13         (Withdrawn from evidence Exhibit No. 201-A.)
14              THE COURT:  All right.  What's the next issue?
15              MS. JAIMEZ:  The next issue is with respect to 202.
16   It's also a disk of a recording.
17              THE COURT:  All right.  So we're not going to send
18   the original disk in, and we'll use my photocopy of the disk in
19   its place.
20              MS. JAIMEZ:  Thank you, Your Honor.
21              THE COURT:  Anything else?
22              MS. JAIMEZ:  The last issue is with respect to
23   202-A.  The transcript of the recording was also erroneously
24   submitted for admission into evidence.  So we would ask that
25   the Court take 202-A out of evidence.  We've also discussed
```

```
1   this with the defense.

2              THE COURT:  Pursuant to agreement of counsel, 202-A

3   was not supposed to be received into evidence, and it will no

4   longer be in evidence, and we will not send it back to the --

5   we will not send 202-A, the transcript, back to the jury;

6   correct?

7              MS. AHMAD:  Yes, Your Honor.

8        (Withdrawn from evidence Exhibit No. 202-A.)

9              THE COURT:  Okay.  Anything else?

10             MS. JAIMEZ:  Nothing else, Your Honor.  Thank you.

11             THE COURT:  Okay.

12       (A recess was taken at 10:11 a.m.)

13       (The following proceedings were held in

14        open court out of the presence of the jury:)

15             THE COURT:  All right.  We're on the record.  All

16  counsel are present.  The defendant is present.  We received

17  two notes from the jury.  The first note was at 11:15.  The

18  second note was at 11:16.  We were making final edits to the

19  jury instructions as counsel was arguing; so I haven't given

20  counsel a copy of the instructions that I read.  So I'm going

21  to ask Shannon now to provide you with a copy so it will be

22  easier to the extent we have questions.

23       I understand from Shannon that counsel have reached an

24  agreement in terms of what the response should be?

25             MS. AHMAD:  Yes, Your Honor.
```

**UNITED STATES DISTRICT COURT**

```
 1            THE COURT:  What is your agreement?
 2            MS. AHMAD:  We believe that the Court should just
 3   reread the instructions to the jury, Your Honor.
 4            THE COURT:  All of them?
 5            MS. AHMAD:  I'm trying to --
 6            MS. JAIMEZ:  No, Your Honor.
 7            MS. AHMAD:  Just the commerce instruction,
 8   Your Honor.  I'm just trying to find --
 9            MS. JAIMEZ:  Your Honor, we can clarify if it's
10   helpful.  So for note no. 1, Your Honor, we would request that
11   the Court refer the jury to the definition of "commerce" and
12   the definition of "affect" contained in the Court's instruction
13   and remind the jury -- so specifically to that instruction,
14   which appears to be no. 17, and remind the jury that all
15   instructions are to be weighed equally and should be considered
16   in their totality.
17        And for note no. 2, we would request that the Court refer
18   the jurors to the Court's Instruction no. 17 and the evidence
19   in its totality.
20            THE COURT:  Well, that doesn't make any sense, but
21   my proposal is the following.  It's pretty clear to me that
22   they want a -- based upon the notes, they asked for note no. 1
23   a clarification of Count no. 2, part 3, which is what they're
24   obviously referring to as the third element of that count.
25   That's the Court's Instruction no. 13.  That's with respect to
```

1    the Hobbs Act, and they're asking for a legal definition of

2    commerce.

3        I think counsel are partially correct that what we need to

4    do is respond and refer the jury to the Court's

5    Instruction no. 17, and perhaps they just have not focused on

6    the fact that Jury Instruction no. 17 which is the definition

7    that we provided them for commerce under the third element of

8    the -- Count 2 of the Hobbs Act.

9        Does everybody agree on that?

10            MS. AHMAD:  Yes, Your Honor.

11            THE COURT:  Okay.  The second item is that they're

12   asking in note no. 2 a specific question, and that is is

13   movement of one money from one state to another proof that

14   commerce was affected?  So what I propose to do is to give them

15   an additional instruction, and this additional instruction is

16   from the jury instructions that were submitted by the parties

17   on June 15, 2015, and appears as document no. 182 which was

18   proposed by the Government and not objected to by the defense.

19   That included the definition of interstate commerce which

20   includes the movement of goods, services, money, and

21   individuals between states.

22       So my proposal would be, in addition to providing them --

23   and I actually have drafted the response, and I'm going to ask

24   Shannon to provide counsel with it.

25            MS. AHMAD:  Your Honor, I'm sorry.

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Wait a minute.  Take a look at it.  I'm
 2    not trying to cut you off.  I just want to make sure you're
 3    focused.
 4       So the first part of the response is simply to restate
 5    Court's Instruction no. 17, and then the second part of the
 6    response is to provide them with what they've asked for, and
 7    that is a definition of commerce which I obtained, as I said,
 8    from Government's proposed Instruction no. 15.  While defense
 9    is looking at it, does the Government have any objection?
10              MR. JAUREGUI:  No, Your Honor.  The only thing we
11    would request is that, once the jury is reinstructed --
12              THE COURT:  I'm not reinstructing them.  I'm simply
13    going to attach this as a response to their note and send it
14    in.
15              MR. JAUREGUI:  Okay.  Then no.  No objection,
16    Your Honor.
17              MS. AHMAD:  Your Honor, the defense is in agreement
18    with what the Court is proposing.
19              THE COURT:  Okay.  Shannon has a form that indicates
20    that response to juror's notes nos. 1 and 2, and the response
21    is going to be what I have provided to counsel, and I'm going
22    to sign it and send it into the jury room.
23       All right.  We'll be in recess.
24       (A recess was taken at 11:57 a.m.)
25              THE COURT:  All right.  All counsel are present.
```

**UNITED STATES DISTRICT COURT**

1    The defendant is present.  We have a note from the jury that
2    they have reached a verdict.  So let's bring in the jury, and
3    we'll take the verdict.
4         (The following proceedings were held in
5         open court in the presence of the jury:)
6              THE COURT:  All right.  The jury has returned.  All
7    counsel and the defendant are present.  We received a note from
8    the jury that the jury has reached a unanimous verdict.
9         Would the foreperson please identify herself.
10             JUROR NO. 3:  Janene Gaines.
11             THE COURT:  All right.  Would you please hand the
12   verdict to the bailiff.
13        All right.  I will now ask the courtroom deputy to publish
14   the jury's verdict.
15             THE CLERK:  United States District Court for the
16   Central District of California, United States of America versus
17   Teofil Brank, CR 15-131(A)-JFW, verdict form for Defendant
18   Teofil Brank.
19        As to the following counts charged against Teofil Brank,
20   Count 1, no. 1, we the jury in the above captioned case
21   unanimously find Defendant Teofil Brank guilty.
22        Count 2, no. 2, we the jury in the above captioned case
23   unanimously find Defendant Teofil Brank guilty.
24        Count 3, no. 3, we the jury in the above captioned case
25   unanimously find Defendant Teofil Brank guilty.

1          Count 4, no. 4, we the jury in the above captioned case

2     unanimously find Defendant Teofil Brank guilty.

3          Count 5, no. 5, we the jury in the above captioned case

4     unanimously find Defendant Teofil Brank guilty.

5          Count 6, no. 6, we the jury in the above captioned case

6     unanimously find the defendant Teofil Brank guilty.

7          Signed the foreperson, dated July 9, 2015.

8               THE COURT:  All right.  Members of the jury, is that

9     the verdicts of each of you so say you all?

10         (Jury responds in the affirmative.)

11              THE COURT:  The jurors have nodded in the

12    affirmative and answered in the affirmative.

13         Does the defendant wish to have the jury polled?

14              MR. CHOWDHURY:  May we have one moment?

15              MS. AHMAD:  Yes, Your Honor.

16              THE COURT:  The clerk will poll the jury.

17              THE CLERK:  Ladies and gentlemen of the jury, if

18    this is your verdict as read and presented, as I call your

19    number, please answer "yes."  If it is not, please answer "no."

20         Juror No. 1?

21              JUROR NO. 1:  Yes.

22              THE CLERK:  Juror No. 2?

23              JUROR NO. 2:  Yes.

24              THE CLERK:  Juror No. 3?

25              JUROR NO. 3:  Yes.

```
 1                    THE CLERK:  Juror No. 4?

 2                    JUROR NO. 4:  Yes.

 3                    THE CLERK:  Juror No. 5?

 4                    JUROR NO. 5:  Yes.

 5                    THE CLERK:  Juror No. 6?

 6                    JUROR NO. 6:  Yes.

 7                    THE CLERK:  Juror No. 7?

 8                    JUROR NO. 7:  Yes.

 9                    THE CLERK:  Juror No. 8?

10                    JUROR NO. 8:  Yes.

11                    THE CLERK:  Juror No. 9?

12                    JUROR NO. 9:  Yes.

13                    THE CLERK:  Juror No. 10?

14                    JUROR NO. 10:  Yes.

15                    THE CLERK:  Juror No. 11?

16                    JUROR NO. 11:  Yes.

17                    THE CLERK:  Juror No. 12?

18                    JUROR NO. 12:  Yes.

19                    THE COURT:  All right.  The Court will instruct the

20    courtroom deputy to file and record the verdict.

21        Counsel, is there any reason why this Court should -- why

22    the Court should not discharge this jury?

23                    MS. AHMAD:  No, Your Honor.

24                    MS. JAIMEZ:  No, Your Honor.

25                    THE COURT:  All right.  Ladies and gentlemen, I want
```

1    to give you one final instruction.

2         Now that the case has been concluded, some of you may have

3    questions about confidentiality of the proceedings.  Many times

4    jurors ask if they're at liberty to discuss the case with

5    anyone.  Now that the case is over, you're of course free to

6    discuss the case with anyone you choose.

7         By the same token, however, I would advise you that you're

8    under no obligation to discuss this case with any person, and

9    always bear in mind, if you do decide to discuss the case, that

10   your fellow jurors fully and freely stated their opinions with

11   the understanding that those views are being expressed in

12   confidence.  So I would ask you to please respect the privacy

13   of the views of your fellow jurors.

14        So we have our alternates here, and unfortunately you

15   couldn't get to deliberate, but you were very -- your

16   participation was certainly very important.  And I want to

17   thank all of the members of the jury for their participation in

18   these proceedings.

19        You are now discharged.

20        (The following proceedings were held in

21        open court out of the presence of the jury:)

22             THE COURT:  All right.  The sentencing date in this

23   matter will be September 21st, 2014.  Is that date and time

24   acceptable?

25             MR. CHOWDHURY:  Your Honor, I believe you mentioned

```
 1   2014.
 2              THE COURT:  I'm sorry.  2015.
 3              MS. AHMAD:  Your Honor, can I have just one moment?
 4              THE COURT:  Sure.  At 9:00 a.m.
 5              MS. AHMAD:  I'll be out of the country, Your Honor.
 6   I'm just conferring with Mr. Chowdhury about other potential
 7   dates.
 8              THE COURT:  Well, why don't we -- I'm going to set
 9   that date because I want to get a presentence report in the
10   process.  Then if you need to continue the date because you're
11   going to be unavailable, we can continue the date.  But I want
12   to set that date today.  That way the presentence report will
13   start preparation, and we can deal with any issues later on.
14        Is that date and time acceptable to the Government?
15              MS. JAIMEZ:  Yes, Your Honor.
16              THE COURT:  All right.  We will be in recess.  Make
17   sure that you check with Shannon to get the exhibits.
18              MR. WHITE:  Thank you, Your Honor.
19        (Proceedings concluded at 12:35 p.m.)
20
21
22
23
24
25
```

88

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4

 5             I, MIRANDA ALGORRI, FEDERAL OFFICIAL REALTIME

 6   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

 7   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

 8   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

 9   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

10   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

11   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

12   CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

13   THE UNITED STATES.

14

15                              DATED THIS  26TH  DAY OF JULY, 2015.

16

17

18                         /S/ MIRANDA ALGORRI

19                         MIRANDA ALGORRI, CSR NO. 12743, CRR
                           FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**