EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
KIMBERLY D. JAIMEZ (Cal. Bar No. 271235)
EDDIE A. JAUREGUI (Cal. Bar No. 297986)
Assistant United States Attorney
General Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4849
    Facsimile: (213) 894-0141
    E-mail:     eddie.jauregui@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>          v.<br><br>TEOFIL BRANK,<br>  aka "Jarec Wentworth,"<br>  aka "@JarecWentworth,"<br><br>          Defendant. | CR No. 15-131(A)-JFW<br><br><u>GOVERNMENT'S SENTENCING POSITION</u><br><br>Hearing Date: October 26, 2015<br>Hearing Time: 9:00 a.m.<br>Location:    Courtroom of the<br>                  Honorable John F.<br>                  Walter |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Kimberly D. Jaimez and Eddie A. Jauregui, hereby files its sentencing position as to defendant Teofil Brank.

//

//

//

The government's position is based upon the attached memorandum of points and authorities, exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 9, 2015          Respectfully submitted,

EILEEN M. DECKER
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


           /s/
EDDIE A. JAUREGUI
KIMBERLY D. JAIMEZ
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.  INTRODUCTION**

On July 9, 2015, a jury convicted defendant Teofil Brank ("defendant") of six counts relating to the extortion and attempted extortion of victim D.B. for over $1.5 million in cash and real property.  Those counts were: (i) transmitting threatening communications with intent to extort, in violation of 18 U.S.C. § 875(d) (count one); (ii) extortion and attempted extortion affecting interstate commerce, in violation of 18 U.S.C. § 1951(a) (counts two and five); (iii) receiving proceeds of extortion, in violation of 18 U.S.C. § 880 (counts three and four); and (iv) use of an interstate facility to facilitate an unlawful activity, in violation of 18 U.S.C. § 1952(a)(3) (count six).  As the Court is well aware from the pre-trial litigation in this case and the trial itself, defendant threatened to publicly disclose the details of D.B.'s private, sexual life via Twitter if D.B. did not meet defendant's demands for large sums of money.  The evidence at trial was overwhelming and at the conclusion of the case, the jury quickly voted to convict defendant on all counts.

On August 14, 2015, the United States Probation Office ("Probation Office") disclosed its initial Presentence Report ("PSR") and Recommendation (Dkt. Nos. 309, 310), and on September 14, 2015, the Probation Office revised the PSR and disclosed an Addendum thereto (Dkt. Nos. 320, 321).  The Probation Office determined that, based on a total offense level of 25 and a criminal history category of III, defendant's Guidelines imprisonment range was 70-87 months.  The Probation Office recommended a low-end sentence of 70 months and a three-year period of supervised release.  (See USPO Recommendation

Letter, Dkt. 309.) Restitution in this case is mandatory and proper restitution amount is $500,000. (Id.)

The government submits that an appropriate custodial sentence in this case is 80 months of imprisonment. As discussed below, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law and provide just punishment, warrant a substantial sentence in this case, one above the low-end of the advisory Guidelines range. Defendant's conduct was vengeful and intentional, and he caused great emotional harm to the victim. Moreover, defendant has failed to show any remorse for his actions and, while he was detained pending trial, he sought to inflict more pain on the victim and garner more fame for himself. Considering the totality of the circumstances, including defendant's decision to procure a firearm and take it to the scene of the attempted extortion, a fair and just sentence for this defendant is 80 months in prison.

## II. STATEMENT OF FACTS

The victim in this case met the defendant, a former pornographic actor and male escort, through a pay-for-sex encounter in 2013. (RT, Dkt. 296-2, 79:3-13, 117:22 to 118:7).[1] As established at trial, the victim, D.B., was a wealthy telecommunications executive who moved in influential circles and had an interest in younger, attractive men who were pornographic actors. After their initial meeting, D.B. began paying defendant to refer other pornographic actors and escorts

---

[1] "RT" refers to the reporter's transcripts of the trial, which were filed by defendant at Docket No. 296 in five parts. Citations include the relevant docket entry followed by the page number.

2

to him for sexual trysts.  (RT, 296-2, 79:7-80:13.)  D.B. continued to pay defendant for sex as well.  Over the course of 2013-2014, D.B. paid defendant for sex about four times and for sex "referrals" about the same number of times. (RT, 296-2, 122:3-16).  In each instance, defendant received roughly $1,500 to $2,000.  (RT, 296-2, 123:3-5.)

The arrangement between D.B. and defendant began to unravel in early 2015, when defendant refused to pay back a referral fee for a sexual encounter that never came to be.  (RT 296-2, 80:21-81:3.)  The catalyst for this unraveling appeared to be D.B.'s telling defendant that he did not think they could have a "working" relationship any longer.  (RT, 296-2, 84:1-24.)  D.B.'s comment triggered an angry and forceful response from defendant, who proceeded to send D.B. a stream of threatening text messages, warning D.B. that he was "feeling evil" and could bring D.B.'s "house down."  (RT 296-2, 83:1-95:8.)  More specifically, defendant warned D.B. that he had a Twitter account and that "lies can be made" and truths told through that medium.  (RT 296-2, 85:20-22.)

The defendant's text messages to D.B. speak volumes about the defendant's intent, as well as his nature and characteristics:

- Be wise on How you reply. **I can bring your house down [D.].** This was a simple conversation and you throw this Shit out on me. **Don't get me mad.** I do have a twitter and your photos. **Lies can be made or Maybe it's the truth.** Just saying. Have a good day. (Items 376-373.)

- You promised me you would Let me drive the r8. Cars are my life you know that.  Show Im Nothing to you. Promises broken. **I'm feeling evil right now**. Disappointed. (Items 358-355.)

- Check my twitter, the conversation will grown and questions will be asked. You lied to me and treated me like Shit. I asked again and you put it behind you.  Now it's biting your ass.  **I think by the time I'm out of the gym you will**

3

        **have a Sweet treat for me that will make me erase my tweet. Think hard. You know me right**. (Items 347-349).

- I can't get a friendship anymore, because **will who want to be friends with black mail**. . . . I guess finding you boys is out of the picture So it leaves me with Nothing to want out of this. **So I'm just going to bite hard.** You got money but I Don't want that. Money won't wash away What people will read and see of you. **Wow I guess I hold the cards right now.** And trust me the other guys will stand with me. (Items 344-345.)

- New deal, new deal (Items 107-106)

- Account will be deleted if new deal is reached. (Item 101)

- I want a condo here in LA. Bachelor pad. You have a taste I like. 2 bed Max. Perfer one. I want 300,000.00 cash. You can and will. I want this over ASAP like yesterday. So you can be at peace. (Item 92)

- They go for more though (Item 90)

- 1 mill cash (Item 89)

(See Excerpt of Trial Ex. 108, redacted for victim's name and telephone number, attached as Ex. 1) (emphases added).[2]

    The defendant did not rely solely on private text messages to convey threats to D.B., however.  He took it a step further; he published a message on Twitter asking his thousands of Twitter followers: "Do any porn stars know a guy named [D.], yes [D.]." (RT, 296-2, 96:2-6.)  As D.B. testified at trial, he became sick to his stomach upon learning this and started shaking, and he was "scared to the core" about what defendant would do next.  (RT, 296-2, 96:15-20, 105:3-9.)  Wanting to avoid public humiliation, D.B. gave in to the defendant's demands.  D.B. wired defendant $500,000 and gave him his

---

[2] Please note that the text messages appear in reverse chronological order, with the more recent text messages appearing first.

4

Audi r8, which was valued at approximately $180,000, because D.B. believed defendant would go through with his threat and expose his secret: that he was paying gay porn stars and prostitutes for sex, sometimes in groups, and frequently. (RT, 296-2, 101:16-23, 102:5-14, 104:5-12, 111:4-8.)

The government will not repeat the entire trial testimony here, but as the Court knows, defendant tried to extort D.B. for another million dollars after he had successfully extorted D.B. the first time. In the run-up to the attempted extortion on March 4, 2015, defendant obtained a .357 Colt Python revolver and brought it with him to the Starbucks where the extortion was to take place. (PSR ¶ 16.) Defendant told the victim over the phone that he was not coming alone and that if anything should happen, he had what he needed "for anything else . . . ." (Id.) Moreover, defendant's friend and companion that evening, Etienne Yim, testified at trial that defendant told him to shoot if anyone started shooting. (RT, Dkt. 296-4, 109:6-10.) The defendant was dead set on collecting $1 million that evening and if anything should go wrong – if the "fed" should show up, for example – defendant was prepared to use force. (See Ex. 2, at 3:23-24)

Ultimately, the defendant was arrested, but he didn't stop trying to harm D.B. The defendant tried, and ultimately did, get a statement to the media purporting to be innocent and accusing D.B. of criminal acts. Among other things, defendant suggested that D.B. had raped him and was a predator. (See Exs. 3 and 4.)[3] He also falsely

---

[3] Exhibit 2 is an April 4, 2015, email from defendant to Christina Buholtz containing the text of what a letter published in a
*(footnote cont'd on next page)*

suggested that D.B. had sexual contact with minors, as the Court knows from the in limine motions in this case. (Dkt. 61)  At the same time, defendant sought to deliver a mea culpa to D.B., hoping that D.B. would "drop" the charges against him.  (See discussion infra.)

**III. THE PRESENTENCE REPORT**

The PSR calculates defendant's total offense level as 25 and criminal history category as III, with a resulting advisory guidelines range of 70 to 87 months in prison. (PSR ¶ 102.)  The PSR groups the offenses for which defendant was convicted into two groups – one for the extortion-related counts (Group A) and the other for the attempted extortion counts (Group B).  (PSR ¶¶ 25-46.)  Each group carries a base offense level of 9 and is enhanced 14 levels because of the amount extorted or demanded by the defendant.  (PSR ¶¶ 30, 37.)  Thereafter, a two-level enhancement is added to reflect the number of "units" grouped together, resulting in a total offense level of 25.  (PSR ¶ 42.)  The government concurs in the Probation Office's analysis and offense level calculation.

As to criminal history:  defendant was convicted in 2008 for domestic violence, and served 120 days in jail for abusing his then-girlfriend and future wife.[4]  (PSR ¶ 51.)  Defendant earned two criminal history points for this conviction.  (Id.)  Defendant earned another two points for convictions in 2008 and 2010 for driving under the influence and driving with a suspended license, respectively.

---

blog called Str8upgayporn.com.  Exhibit 3 contains images of the letter as published on Str8upgayporn.com.

[4] The following year, defendant was arrested for battery against a spouse or cohabitant but that count was dismissed.  According to the PSR, a description of the offense is unavailable.  (PSR ¶ 59.)

(PSR ¶¶ 52-53.)  Because defendant committed the instant crimes while on probation, defendant's criminal history points total six, placing him in criminal history category III.[5]  (PSR  ¶¶ 57-58.)  The government concurs in the Probation Office's determination of defendant's criminal history.  Finally, the government agrees with the Probation Office that, given the total offense level and defendant's criminal history, the advisory Guidelines range applicable is 70 to 87 months.  (PSR ¶ 102.)

## IV. THE GOVERNMENT'S SENTENCING POSITION

The government recommends that the Court impose a sentence of 80 months of imprisonment, followed by a three-year period of supervised release, and a special assessment of $600.  The government submits that such a sentence is sufficient, but not greater than necessary, to address the offenses at issue, taking into account all the factors the Court must consider under 18 U.S.C. § 3553(a).  See <u>United States v. Booker</u>, 543 U.S. 220, 260 (2005).

### A. The nature and circumstances of the offenses and defendant's history and characteristics justify an 80-month prison sentence.

#### 1. Nature and circumstances of the offense

The nature and circumstances of defendant's offenses warrant a sentence of 80 months of imprisonment.  In mid-February 2015, the defendant successfully extorted the victim of a half million and a vehicle worth $180,000.  He did so by exploiting the victim's fears and threatening to expose the most intimate details of the victim's

---

[5] Not captured in defendant's criminal history is his admitted use of steroids, cocaine, marijuana, and ecstasy.  (PSR ¶¶ 81-84.)  Defendant admitted to the Probation Office that he had used cocaine approximately 30 times in the past year alone.  (<u>Id.</u> at ¶ 83.)

private life to the public via Twitter. The defendant was a relatively well-known pornographic actor with thousands of Twitter "followers." (Dkt. 296-3, 80:6-9.) The victim, a businessman, was well known in wealthy and influential circles, and he feared the shame and public humiliation that would accompany disclosure of his private sexual proclivities and engagement with prostitutes.[6]

The defendant capitalized on this fear. Not only did he obtain a half million dollars and a car from D.B. relatively easily in February 2015, he came back for more. Seeking a "new deal," defendant demanded a full million dollars and the title to D.B.'s Audi r8. And in order to ensure that things went smoothly, defendant procured a gun and brought it with him to the scene of the attempted extortion, along with ammunition. The fact that defendant came armed to the extortion demonstrated that he was willing to deploy violence to ensure successful completion of his scheme. Defendant's conduct was opportunistic, lawless, and dangerous, and it was motivated by greed. Such conduct merits serious punishment.

---

[6] At trial, the victim testified that he was especially concerned about this information being disclosed online:
> The truth that he knew about me that was so embarrassing and shameful was that I had been paying for sex. . . . I was afraid that he would post that truthful information to his Twitter account and that that information, with the way the internet works today, would spread like wildfire . . . . In other words, if something, either a lie about me were published on social media or an embarrassing truth, then, even if that was posted for a matter of hours, people could, for example, retweet it. They could blog about it. They could do any number of things almost instantly, and you'd never really be able to get that negative information, whether it was the truth or lie, back.

(RT, 296-2, 85:24 – 87:4).

8

### 2. Defendant's history and characteristics

As noted above, defendant's text messages to D.B. provide a window into defendant's mindset. Although D.B. was the wealthy executive with the high-profile connections, the defendant "[held] the cards," and he knew it. Defendant had the perfect extortion victim in D.B.: someone with a lot of money and a lot to hide. And defendant was well positioned to exploit D.B., given his own status as a well-known pornography actor with a large Twitter following. Ultimately, defendant did exploit D.B.'s fears to enrich himself and, it seemed, he hoped to keep coming back to the well.

Once defendant was arrested, he continued to victimize D.B. As noted above, defendant released a statement accusing D.B. of rape and even went so far as to accuse D.B. of having sex with under-age minors. He did so while detained in the Metropolitan Detention Center and, all the while, seeking release. Moreover, defendant's prisons email suggests that defendant sought to prevent or at least discourage witnesses from testifying at trial. (Ex. 5.) And still today, defendant has not shown any remorse for his actions. Although defendant tried to get an "apology" to D.B. through his girlfriend soon after he was arrested, that apology was a transparent attempt to get D.B. to "drop" the charges against him. (Ex. 6 (redacted).) Notably, at a detention hearing on April 2, 2015, Magistrate Judge Wilner characterized the "apology" as "bizarre" and stated that he doubted the "legitimacy of the statements" defendant made in the email.

In light of defendant's egregious and dangerous conduct, his exploitation of the victim, and his lack of remorse, a sentence of 80 months is a fair, just and appropriate.

9

**B. The Court should sentence defendant to 80 months to reflect the seriousness of the offense, deter others from committing extortion by threat to reputation via social media, and promote respect for the law.**

As the Court knows from the pre-trial litigation in this case, there are few published federal cases addressing Hobbs Act extortion by non-violent threat to reputation, and, to the government's knowledge, none involving social media. In many ways, this case was a first for our District. With the growing popularity of social media, however, and rapid changes in technology, it likely will not be the last. A sentence of 80 months of imprisonment would reflect the serious nature of the crime of extortion, even when committed by "non-violent" threat to reputation. It would also deter others from committing such crimes via social media and promote respect for the law.

Defendant's conduct in this case was extremely serious. The nature of the threat was serious in that defendant threatened to expose the most intimate details of the victim's life to the public in attempt to shame and humiliate him. Defendant was prepared to "bring down [D.B.'s] house" by opening up the most private part of D.B.'s life – the part D.B. most wanted to keep secret. Moreover, the amount of money defendant obtained and demanded from D.B. was significant. Defendant managed to get $500,000 and a $180,000 car from the victim, before coming back to D.B. and demanding another million. Defendant was not operating in small dollar amounts. He committed a serious crime at a high level and he should be punished commensurately.

Finally, a sentence of 80 months would promote respect for the law.  This is not a "social media embarrassment case."  This is a high-dollar extortion case involving the intimate details of the victim's private life — one that came to involve a firearm.  A sentence of 80 months would send a message that the law will not tolerate extortion, even when it is "non-violent," but especially where the defendant brings a firearm and thereby sets up the potential for a violent and disastrous outcome.

**V.   CONCLUSION**

For all of the foregoing reasons, the government respectfully recommends that the Court sentence defendant to 80 months of imprisonment, followed by a three-year period of supervised release.