1        UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE

4                  - - - -

5

6

  UNITED STATES OF AMERICA,        )
7                                   )
                    PLAINTIFF,      )
8                                   )
       vs.                          )    No. CR 15-131(A)-JFW
9                                   )
  TEOFIL BRANK,                     )
10                                  )
                    DEFENDANT.      )
11  _____)

12

13           REPORTER'S TRANSCRIPT OF

14                  SENTENCING

15          TUESDAY, OCTOBER 27, 2015

16                  9:03 A.M.

17           LOS ANGELES, CALIFORNIA

18

19

20

21

22    _____

23       SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR
         Official Reporter, U.S. District Court
24              255 East Temple Street
               Los Angeles, CA  90012
25                  213.894.5949

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                    APPEARANCES OF COUNSEL:

 2

 3    FOR THE PLAINTIFF:

 4          OFFICE OF THE UNITED STATES ATTORNEY
            BY:  KIMBERLY D. JAIMEZ and EDDIE A. JAUREGUI
 5               ASSISTANT UNITED STATES ATTORNEYS
            312 NORTH SPRING STREET
 6          LOS ANGELES, CALIFORNIA  90012
            213.894.3779; 213.894.4849
 7

 8

 9    FOR THE DEFENDANT:

10          OFFICE OF THE FEDERAL PUBLIC DEFENDER
            BY:  SEEMA AHMAD and ASHFAQ G. CHOWDHURY
11               DEPUTY FEDERAL PUBLIC DEFENDERS
            321 EAST 2ND STREET
12          LOS ANGELES, CALIFORNIA  90012
            213.894.4787; 213.894.1456
13

14

15    FOR THE VICTIM:

16          SIDLEY AUSTIN, LLP
            BY:  DOUGLAS A. AXEL
17               ATTORNEY AT LAW
            555 WEST FIFTH STREET, SUITE 4000
18          LOS ANGELES, CALIFORNIA  90013
            213.896.6000
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, OCTOBER 27, 2015

 2                             9:03 A.M.

 3                             - - - -

 4         THE CLERK:  Calling item No. 1, CR 15-131(A)-JFW,

 5    United States of America versus Teofil Brank.

 6         Counsel, please state your appearances.

 7         MS. JAIMEZ:  Good morning, Your Honor.  Kimberly

 8    Jaimez on behalf of the United States, and with me at counsel

 9    table is Assistant U.S. Attorney Eddie Jauregui.

10         MS. AHMAD:  Good morning, Your Honor.  Seema Ahmad and

11    Ashfaq Chowdhury on behalf of Mr. Brank, who is present in

12    custody.

13         THE COURT:  All right.  Good morning to all.

14         This matter was originally scheduled for imposition of

15    sentence yesterday, October 26, 2015.  However, the government

16    raised the issue that there were concerns that the Court lacked

17    jurisdiction to proceed with the sentencing of Mr. Brank due to

18    the pendency of the appeal that the government had filed from

19    the Court's dismissal of one of the counts of the first

20    superseding indictment.  The government had indicated that it

21    had made a motion to dismiss the appeal, and that dismissal had

22    not been acted on by the Ninth Circuit yesterday at the time

23    that we were prepared to proceed with sentencing.

24         I have now been provided with a copy of the order of the

25    Ninth Circuit that was filed on October 26th, 2015, and that
```

```
 1  order indicates that the appellant's motion for voluntary
 2  dismissal of the appeal is granted and the appeal is dismissed.
 3  The order further states that the Ninth Circuit's order shall
 4  be served on the district court and shall act as the mandate of
 5  the Ninth Circuit Court of Appeals.  So based upon that order,
 6  it is my view that the matter is ready to proceed to sentencing
 7  today.
 8       So may I ask counsel, is there any reason why judgment and
 9  sentence should not be imposed at this time?
10            MS. AHMAD:  No, Your Honor.
11            MS. JAIMEZ:  No, Your Honor.
12            THE COURT:  All right.  If counsel will approach the
13  lecturn with Mr. Brank, I will then proceed.
14       Has counsel and the defendant read and discussed the
15  presentence report, the revised presentence reports and the
16  various addenda that had been filed by the probation
17  department?
18            MS. AHMAD:  Yes, Your Honor.
19            THE COURT:  All right.  Although the United States
20  guidelines are now advisory, the Court must still consider the
21  advisory guideline range in addition to the other directives
22  set forth in Section 3553(a) and impose a sentence that is
23  sufficient but not greater than necessary to comply with the
24  purposes of the Act.
25       As counsel knows, this Court follows a two-step or a
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  two-phase sentencing process.  In phase one, I will determine

2  or calculate the applicable advisory guideline range, which

3  will require the Court to resolve any objections to the

4  presentence guideline calculations as well as and any factual

5  disputes.  Thereafter, I will determine whether, pursuant to

6  the Sentencing Commission policy statements, any departures

7  from the advisory guidelines apply.

8      In this case, in July of 2015, the defendant was convicted

9  after a jury trial on Counts 1, 2, 3, 4, 5 and 6 of the first

10 superseding indictment.

11     The probation officer filed the original presentence

12 report on August 14th.  It appears as document number 310

13 together with the probation officer's recommendation letter.

14 The probation officer subsequently filed various addenda and

15 revised presentence reports that appear as docket numbers 320

16 and 334.  The revisions made by the probation officer in the

17 various revised presentence reports did not affect the original

18 guideline calculation.

19     As to the guideline calculation, the probation officer has

20 made the following advisory guideline calculations.  In the

21 presentence report, the base level has been calculated at level

22 nine.  To that, the probation officer has added a 14-level

23 enhancement set forth in paragraph 30 in connection with the

24 amount of the loss.  To that, the probation officer has also

25 added a two-level enhancement or two-level increase for the

1    multiple counts, which is set forth in the probation

2    presentence report.  The combined adjusted offense level is

3    calculated at level 25.  The probation officer has also

4    calculated defendant's criminal history category at III.  The

5    resulting advisory guideline range is 70 to 87 months.

6          The defendant filed his sentencing position paper and

7    raised one phase one issue, and that issue related to the

8    objection to the probation officer's assertion that the

9    defendant is a citizen of another country.  The government

10   argued in its recent filing that the immigration status of the

11   defendant is not before the Court.  I agree; however, it does

12   appear that it is important with respect to any placement by

13   the Bureau of Prisons of the defendant.  So the probation

14   officer I think has correctly revised the presentence report to

15   indicate on page 3 that the citizenship -- United States

16   citizenship verification pending, as well as immigration

17   status, naturalized citizen verification pending.  So I think

18   that should have addressed the defendant's concerns with

19   respect to the presentence report.

20         MS. AHMAD:  Yes, Your Honor.

21         THE COURT:  All right.  I don't see any other phase

22   one issues raised by the defense, but if I've missed any,

23   please let me know.

24         MS. AHMAD:  No, Your Honor.

25         THE COURT:  The government has also filed its

1    sentencing position paper.  That was filed on -- the initial

2    one was filed on October 9th and it appears as document number

3    326.  I have reviewed that position paper, and it doesn't

4    appear that the government has raised any phase one issues, but

5    I want to confirm with counsel that that's correct.

6          MS. JAIMEZ:  That's correct, Your Honor.

7          THE COURT:  All right.  If there are no other phase

8    one issues or there are no phase one issues, then I will

9    conclude phase one and calculate the advisory guideline

10   consistent with the probation officer's calculations, and that

11   is a total offense level of 25, defendant's criminal history

12   category a category III, and the resulting advisory guideline

13   range of 70 to 87 months.

14        After calculating the advisory guideline range, in phase

15   two I must consider the Congressional goals of sentencing as

16   set forth in the Sentencing Reform Act and impose a sentence

17   that is sufficient but not greater than necessary to reflect

18   the principles stated in 3553(a) and accomplish the goals or

19   needs of sentencing as set forth in Section 3553(a)(2).

20        I've read all of the materials that have been submitted by

21   counsel, but certainly I will hear argument from counsel.  But

22   before I do that, there is one additional housekeeping matter

23   that, in light of the government's position that I didn't have

24   jurisdiction, I withheld, and that is the unopposed ex parte

25   application for an order to transfer Mr. Brank to a conference

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    room, and that application is unopposed, and so I'm going to

2    sign that application, and I'll ask the courtroom deputy to

3    file that order today.

4         So I will hear from defense counsel.

5         Let me ask the government first, however, does the victim

6    in this case wish to be heard?

7              MS. JAIMEZ:  Your Honor, my understanding is that the

8    victim's counsel wishes to be heard on behalf of the victim.

9              THE COURT:  All right.  Then let me hear from the

10   victim's counsel first before I hear from the defendant.

11             MR. AXEL:  Yes, Your Honor.  Thank you.  Very briefly.

12        The victim is present in court.  He did testify

13   extensively, obviously, during the trial about the crimes and

14   the impact they've had.  Obviously, it's been very difficult

15   for him.  He did want to be here, and he is here, to show

16   respect for the process and, obviously, as an interested

17   observer.  At the same time, given the emotional toll involved,

18   he's asked me to just say a few words on his behalf.

19        First, he asked me to thank the Court for the time

20   afforded to this case and for the consideration given to all

21   aspects of it.  Of course, the statute requires that victims be

22   treated with fairness and respect, and he -- I know he feels

23   that he has been treated with fairness and with respect in this

24   courtroom, is grateful for that.

25        Second, he did testify to the impact that the crimes had

1    on him, and I think equally significantly, we just wanted to

2    highlight for the Court the defendant's post-offense conduct.

3        As described in the government's papers, the defendant did

4    continue to harm the victim even after the defendant was

5    arrested.  First, as the Court is aware from the record, he

6    tried to persuade the victim to drop the charges, and then when

7    that failed, he falsely accused the victim of various things to

8    try to intimidate him and punish him, in our view, for having

9    come forward and turned the case over to the authorities.

10   Given the pattern of conduct, both the criminal history of the

11   offense and post-offense conduct, it's our view that he was and

12   remains a danger to the community.

13       Finally, Your Honor, although the victim knew the adverse

14   impact of coming forward to law enforcement was likely to have

15   on his own life, he did do the right thing by coming forward

16   and turning the case over to the authorities.

17       THE COURT:  Well, he really had no choice.  Based upon

18   what had gone on, it would appear to me that -- of course, you

19   know, I certainly am sympathetic to the victim in this case;

20   however, these events were of his own creation.  He created

21   this dilemma that he found himself in, and unfortunately for

22   him, given Mr. Brank's conduct in terms of his continuing

23   efforts to extort money from the victim, he really had no

24   choice but to go to law enforcement, otherwise he would be

25   plagued with Mr. Brank and his efforts to continue to extort

1    money for, who knows, for the rest of his life.

2           MR. AXEL:  Yeah.  It's a good thing -- I will say he

3    did come forward before the successive attempts.  That

4    happened -- but absolutely, look, I think he felt that he had

5    no choice, and he did it, and I think it was the right thing.

6         The offense conduct, obviously, is technologically easy

7    for someone like the defendant to commit, and in our view is

8    highly destructive to victims.

9         So we would ask that the Court impose a guideline sentence

10   in order to promote respect for the law, to send an appropriate

11   message of deterrence, to provide just punishment, and to

12   protect the victim and the public.

13        Thank you, Your Honor.

14           THE COURT:  All right.

15           MS. AHMAD:  Thank you, Your Honor.

16        The Court clearly has a full understanding of the offense

17   conduct in this case.  It's been briefed thoroughly, and

18   obviously, we sat for trial in this case, and I think a

19   question of the facts and what happened and what Mr. Brank did

20   is not really in question.  I would submit to the Court, Your

21   Honor, that I do not believe that this case is a guidelines

22   case, for several reasons.

23        One, as we know, the guidelines are primarily driven by

24   the loss amount, the plus-14 enhancement in this case, and I

25   don't think that that's a good proxy for what I understand is

1   the harm that has been suffered by the victim in this case.

2         Moreover, Your Honor, I just would like to talk very

3   briefly about Mr. Brank and how he came to this position in his

4   life.  It's a little bit difficult because, clearly, it's

5   always hard for a defense attorney to see a client brought for

6   sentencing, especially after a very contested trial.  But

7   Mr. Chowdhury and I have spent quite a bit of time with

8   Mr. Brank, and what has come out, Your Honor, is what I view as

9   a painful and tragic past.

10        I think as the Court knows from the PSR and from our

11  papers, this case has allowed Mr. Brank to really look into his

12  childhood and see how that has shaped him.  And I say this

13  coming from a perspective of not always having the smoothest

14  relationship with Mr. Brank and it coming out in various

15  conversations that his father was very, very, very physically

16  abusive: chaining him, sometimes to his bed, giving him a

17  bucket to urinate in; beating him; beating his brothers and

18  sisters.  His mom was violent, throwing knives at the kids,

19  verbally abusive, and she tried to commit suicide, and

20  Mr. Brank was one of the children that saw her in the garage,

21  hanging, before his father cut her down.  More recently I found

22  out that when the family didn't have enough food for the 10

23  kids, she would feed them sleeping pills just to pacify them.

24        It's not meant to excuse Mr. Brank's behavior, and I again

25  want to acknowledge that notwithstanding my issues with

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Mr. Burns and the wealth and the power and his own actions that

2    play in this case, I do understand that this must have been

3    incredibly scary and traumatic for him.  I just ask the Court

4    to consider who Mr. Brank is and how he got to this point in

5    his life and to think about whether a heavy term of custody

6    really does promote the ends of justice in this case.  I don't

7    think that a term of four, five, six years is required for

8    either specific or general deterrence in this case, Your Honor.

9         This was a highly specific relationship that Mr. Brank had

10   with the victim for two years, much of which we don't really

11   have a full understanding of.  It's not a sort of easily

12   repeatable, I think, offense in terms of general deterrence,

13   and I don't think a term of custody is going to rehabilitate

14   him and help him deal with the issues that got him to this

15   place.

16        I have seen, in my conversations with him, this desire to

17   have a productive, quality life, and I think he knows that he's

18   going to have to do the therapeutic and the psychological work

19   to get there.  I know his girlfriend, Ms. Buholtz, who's here,

20   who's been at every court appearance, desperately wants him to

21   get the mental health treatment that he needs.

22        And with that, Your Honor, I understand that a year and a

23   day may seem excessively lenient.  I would ask the Court to

24   think about imposing a term of 24 months, with a recommendation

25   to RDAP for Mr. Brank to address some of the substance abuse

```
 1    issues that got him to this place.

 2         Thank you, Your Honor.

 3          THE COURT:  One of the problems I have with this case

 4    is that Mr. Brank has apparently either decided at the outset,

 5    or as the case developed, not to accept any form of

 6    responsibility for his criminal conduct.  As his friend,

 7    Mr. Hattig, points out in his letter, I, on several occasions

 8    during the course of these proceedings -- and you're correct,

 9    it was a hotly contested matter.  And I certainly disagree with

10    Mr. Hattig's observations that is somehow critical or critical

11    of your, defense counsel's, performance, because you served

12    Mr. Brank not only well in this case, but above and beyond

13    well.  The representation that you provided him was excellent,

14    beginning with the motion to suppress the gun, and through and

15    including the motion to dismiss the 924(c) count.  Of course,

16    you had a little help from the U.S. Supreme Court.  But I can't

17    remember, and I certainly don't have the ability to go -- I do

18    have the ability, but it's really not that important, how many

19    times that I tried to communicate to Mr. Brank in open court in

20    my comments.  I think at one point in time we talked about the

21    claim of right defense, and I opined -- in "opine," I suggested

22    that maybe it was viable with respect to the $500,000, but it

23    certainly wasn't in terms of the million dollars.

24         Notwithstanding all of that, Mr. Brank, through not only

25    I'm sure the advice that you gave him in terms of the
```

1  overwhelming nature of the evidence in this case, but more

2  importantly, as indicated in Mr. Hattig's letter, he chose not

3  to accept responsibility and go forward.  And the question that

4  I have in my mind -- and certainly he had the right to go to

5  trial.  He has the absolute right to have the government prove

6  his guilt beyond a reasonable doubt.  I suspect deep down that

7  this going to trial was a continuation of his efforts to harm

8  the victim in this case, because he recognized that the victim

9  would have to come up, get on the stand, and he would have to

10  admit to some very, basically, criminal conduct, and that

11  obviously could have been avoided if Mr. Brank had chose to

12  dispose of the case.

13      I just don't see at any point in time during the course of

14  these proceedings, including up to today, that Mr. Brank has

15  accepted responsibility for what he has done.  It's just a

16  cold, calculated effort to not only extort money but also to

17  harm the reputation of the victim in this case.

18      And I'm going to inquire of the government as to the

19  status of any investigation with respect to the victim in this

20  case, because certainly there was an admission of criminal

21  conduct on the witness stand.

22      So that's my fundamental problem with fashioning a

23  sentence in this case.  I just can't simply get over the hurdle

24  of Mr. Brank's conduct not only in connection with the offense

25  conduct, but even after he was arrested, as the government

```
 1   points out in its sentencing position papers, to continue to
 2   try to harm the client in various communications with the -- I
 3   call it loosely "the press."  And also the fashioning of the
 4   defense.  We went through a series of in camera filings where I
 5   required an offer of proof as to what the defense was going to
 6   be, and ultimately that defense was not put on, but he
 7   communicated that defense to, apparently, the press, and it's
 8   just a continuing effort, evil, evil effort on Mr. Brank's part
 9   to harm the victim in this case.  I understand that, you know,
10   relationships come to an end, but at some point in time you
11   have to get on with life.  And that's the problem I have with
12   Mr. Brank.
13       So you can address that, or if Mr. Brank chooses to
14   address that, I certainly want to hear from Mr. Brank.
15           MS. AHMAD:  I'm sure Mr. Brank will address that, Your
16   Honor.  I'll just briefly address it as well.
17       I can just say categorically that the decision to go to
18   trial did not have to do with harming the victim.  I can see
19   why it would appear that way from not having been in the
20   conversations that Mr. Chowdhury and I had with Mr. Brank, but
21   that was not at all part of the calculus.
22       My intention in going into Mr. Brank's background and
23   history is to demonstrate to the Court that he's -- he's a
24   young man with severely impaired judgment that I think is
25   really the result of unimaginable trauma.  I mean, you could
```

1    imagine.  He's been sexually abused, physically abused,

2    verbally abused.  And I know the Court sees defendants come in

3    here all the time with that kind of history.  What I can say

4    is -- and Mr. Chowdhury and I again, we have this understanding

5    of how that has deeply and severely affected him.  I mean, this

6    is a young man who at the age of 20 decided to go into an

7    industry to perform sex acts for pay, and then decided to

8    prostitute himself to Mr. Burns.  He's not someone who has made

9    productive, thoughtful decisions about his life, and I think

10   that in part he bears responsibility for that, and I think this

11   case is helping him turn a corner in understanding that, and in

12   part I think that that is the result of a young man who was

13   repeatedly, repeatedly abused.

14        I understand from the papers and from the look of the

15   case, he appears to be greedy and evil, and I'm asking the

16   Court to consider that he has made mistakes and he has done

17   harm in this case, but I don't think that that's the summary of

18   who he is.  I think that he is in part born out of the trauma

19   that he has suffered, and I think he has the desire and the

20   ability now, the early stages of the ability, to self-recognize

21   and to try to work on that.

22             THE COURT:  All right.  Does your client wish to be

23   heard?

24             MS. AHMAD:  Yes, Your Honor.

25             THE DEFENDANT:  Before trial, you know, I was full of

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    pride.  You know, I -- I thought I can get away with whatever I
2    wanted to do.  And I was wrong.  I messed up.
3         I want to apologize to Mr. Burns.  I betrayed our
4    friendship and loyalty, and I've done the unthinkable, and I
5    regret it.
6         Losing -- losing trial is a reality check and major
7    wake-up call.  It completely broke me.  And I want to change.
8    I've -- I've came to acceptance of this, and I have to take
9    responsibility for it.  I do regret my actions, and I don't
10   give any excuses for it.  I did what I did.
11        I want to better myself.  I need help.  I am afraid.
12   Seventy, 80 months, it scares me a lot.  I have learned my
13   lesson, and I want to start building myself back up, living an
14   honest life, doing good.  I want to get a college education.  I
15   want to start a family.  And I'm afraid of the time that I'm
16   going to be facing.  I'm going to lose my partner, my
17   girlfriend, because, you know, and she's -- she's been there
18   for me, and she's helping me.  I owe it to myself and to her to
19   change my ways, and I really do want to change, and I'm asking
20   for a second chance, for mercy.
21        This is the scariest -- it's hard to take in, but my
22   actions have consequences, and through pain and suffering we
23   learn, and I just want you to know that I do regret it, and --
24   and I was just full of pride.
25             THE COURT:  I don't understand.  What do you mean by
```

```
 1      you were full of pride?

 2               THE DEFENDANT:  My ego.  I -- my nose was too high in

 3      the sky.  I don't know how else to put it.  I thought I was

 4      better, I deserved better, I deserved whatever I thought I can

 5      do, and I was wrong.

 6               THE COURT:  But after you got caught, I mean, that

 7      whole concept goes out the window.  Now you're faced with a

 8      criminal prosecution.  You're faced -- I assume that you

 9      understood what I was trying to communicate to you through

10      statements during the course of the trial in terms of the

11      outcome.  I don't think there was any doubt, based upon the

12      overwhelming evidence, that you were going to be convicted, yet

13      you didn't accept responsibility, and there is a time when, you

14      know, your pride is over.  You're now caught.  You're now

15      facing the prospects of a criminal prosecution and how best to

16      resolve that criminal prosecution, and to wait until after a

17      conviction to stand before me and say that you accept

18      responsibility really comes a little too late.

19               THE DEFENDANT:  I understand that.

20               THE COURT:  I see defendants come in every Monday who

21      stand before me for sentencing and are sorry for what they've

22      done, and obviously I have to make a determination as to

23      whether or not that's a credible statement, and I make that

24      determination based upon the conduct of what went on during the

25      course of the case.  And in your situation, not only did you
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    not stop trying to hurt Mr. Burns after you were arrested, you

2    continued while you were in custody.

3         THE DEFENDANT:  I'm -- was very stubborn.  I don't

4    know how to explain that.  It was just, in my head, just things

5    were different, and it wasn't till losing trial that really hit

6    me.

7         THE COURT:  Well, obviously it was going to hit you

8    then, when the jury comes back with a guilty verdict.

9         THE DEFENDANT:  It did.

10        THE COURT:  And there was no doubt in most reasonable

11   individual person's mind that that's what was going to happen

12   based upon the evidence.

13        THE DEFENDANT:  I don't know what was going on up in

14   my head.  All I know is that I needed this wake-up call.

15        THE COURT:  Well, you certainly got it.

16        THE DEFENDANT:  Yeah.  And I just, I hope you can help

17   me, work with me, allow me to show you my potential.  I'm

18   afraid to spend the rest of my 20s, and more, in prison.  It's

19   not the life I want.  I can do so much better, and I want to

20   show you.  Just work with me, please, if you can.

21        THE COURT:  I'm looking at the presentence report,

22   specifically the education and employment.  Based upon the

23   presentence report, you graduated from high school in 2007.

24   Then what did you do thereafter in terms of employment?  The

25   probation officer, in paragraph 87, commences with your

```
1   employment as an actor in the gay pornography print and film

2   business.

3          THE DEFENDANT:  Well, I just got into construction.  I

4   couldn't afford college, and, you know, my self-worth was

5   destroyed, and I didn't think I could do better.  I didn't have

6   someone there to guide me, to push me toward the right path,

7   and it just cumulated into bad choices, and...

8          THE COURT:  So I see from January of 2008 to January

9   2013 you worked as a residential painter.

10          THE DEFENDANT:  Yes.

11          THE COURT:  All right.  Is there anything else you

12   want to add?

13          THE DEFENDANT:  I want to apologize to the courts for

14   this time, for this whole process, apologize to the government

15   for continuing it and taking it to trial.  I shouldn't have

16   done that, and I do regret it.  I'm very stubborn, and --

17   and -- and I am sorry.  I guess that's it.  I apologize.  I'm

18   sorry.

19          THE COURT:  Anything else?

20          THE DEFENDANT:  Help me, God.  I don't know.

21          MS. AHMAD:  Nothing further, Your Honor.

22          THE COURT:  All right.  Does the government have

23   anything it wishes to add to its papers?

24          MS. JAIMEZ:  Yes, Your Honor.

25          Your Honor, the government is recommending a sentence in
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   the middle of the guideline range, 80 months.  The government
 2   is not recommending high end.  The government did not seek an
 3   upward departure to account for the defendant's actions in
 4   connection with obtaining a gun and bringing a gun in his
 5   getaway car, even though those actions are not reflected in the
 6   guideline range.  The Court went over the offense conduct, Your
 7   Honor.  The base offense level and the specific offense
 8   characteristics don't account for the gun.  Notwithstanding,
 9   Your Honor, the government has conformed with the
10   recommendation, within the guidelines, simply in the middle of
11   the range.
12        Defense, on the other hand, Your Honor, is now requesting
13   24 months, which is equivalent to essentially a 12-level
14   variance, Your Honor, on the basis of a characteristic, Your
15   Honor, common to most defendants that appear before this Court.
16   Many defendants, unfortunately, sadly, have faced trauma in
17   their past, have faced difficult childhoods, and accept
18   responsibility late.  However, Your Honor, those facts alone do
19   not merit the type of substantial variance that this defense is
20   asking for.  Rather, a mid-range sentence of 80 months is
21   sufficient but not greater than necessary to meet the
22   sentencing goals articulated in 3553(a).
23        Your Honor, this was a serious offense.  This offense
24   involved both completed extortion as well as attempted
25   extortion.  The defendant was able to obtain a $500,000 wire
```

1    transfer as well as an Audi, and while the victim is expected

2    to receive back most of those funds, over $50,000 have been

3    lost.

4        In addition to the loss financially, defense is correct

5    that the financial loss is not a sufficient proxy for the harm

6    in this case.  It is one aspect, but it is not the entire

7    aspect.  As the Court has already acknowledged and saw in

8    trial, the victim has suffered substantial psychological harm

9    as a result of these proceedings and as a result of the

10   defendant's conduct, both --

11       THE COURT:  Is there an investigation pending over the

12   conduct of the victim?

13       MS. JAIMEZ:  Your Honor, the government has no

14   information about a pending investigation at this time.

15       THE COURT:  Well, is the government undertaking any

16   such investigation?

17       MS. JAIMEZ:  Your Honor, I have no information about

18   any investigation at this time.

19       THE COURT:  What do you mean you don't have any

20   information?  You're the government.  You're representing the

21   government.

22       MS. JAIMEZ:  Yes, Your Honor.  However, the government

23   does not have any information with respect to any open or

24   potential pending investigations with respect to the victim.

25   And even if there were any, Your Honor --

1          THE COURT:  So that means there is none.

2          MS. JAIMEZ:  Your Honor, I am not apprised of any,

3    Your Honor.

4          THE COURT:  Well, if you're not, who would be?

5          MS. JAIMEZ:  At this time, Your Honor, even if there

6    were a pending investigation, it would not be something that

7    would be appropriate for discussion in open court at this time.

8          THE COURT:  Well, you may not think so.

9       Go ahead.

10         MS. JAIMEZ:  In addition to the loss and the financial

11   harm, Your Honor, the Court's also directed to look at the

12   history and characteristics of this defendant.  This is not a

13   first-time offender, Your Honor.  This is not a defendant with

14   one criminal history point.  This is a history --

15         THE COURT:  Yeah, but I think his criminal history is

16   overstated.

17         MS. JAIMEZ:  Well, it does include at least one

18   conviction of violence, of spousal battery, in which he

19   received four months' imprisonment, which is not common for a

20   domestic violence-related charge.  Four months' imprisonment

21   followed by three years of probation.

22      But what's more, Your Honor, the defense has posed in its

23   papers that the reason for the criminal history and the

24   admitted substance abuse can be tracked back to the defendant's

25   difficult childhood, and yet again I would emphasize for the

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Court that, unfortunately, that is the case with many

2    defendants that appear in these courts, and it is not a

3    sufficient basis for the type of variance being requested.

4         Your Honor, the 3553(a) factors also ask that the Court or

5    direct the Court to consider general deterrence.  This was an

6    easy crime, Your Honor, a technologically easy crime that has

7    made it to the media.  People are looking at this case, and if

8    this defendant receives a lenient sentence, notwithstanding the

9    fact that he is a category III defendant, receives a lenient

10   sentence, it sends the message, Your Honor, that the upside for

11   such conduct outweighs any potential prison sentence.

12        By sentencing this defendant, Your Honor, within the

13   guideline range, a midpoint in the guideline range, the Court

14   assists in supporting general deterrence for anyone else who

15   might look at this case as an example, an easy way to make

16   money, especially if one is able to quickly hide the funds.

17   And if the sentence is simply 24 months, well, the upside might

18   outweigh the downside.

19        THE COURT:  So you think somebody's going to sit down

20   and say, "Gee, the Court imposed 24 months on Mr. Brank, so now

21   that I'm going to participate in this social media extortion,

22   I'm going to weigh the risk and the benefits based upon a

23   24-month sentence"?

24        MS. JAIMEZ:  That's one possibility, Your Honor.

25        THE COURT:  It's a possibility, but it's totally

 1    unrealistic.  But nonetheless, you have anything else you want

 2    to add?

 3              MS. JAIMEZ:  Yes, Your Honor.

 4              THE COURT:  All right.  Well, be brief.  Because I've

 5    read your papers, and right now you're just simply repeating

 6    what's in your papers.

 7              MS. JAIMEZ:  The guidelines, the guideline sentence,

 8    Your Honor, would also ensure that the Court avoids any

 9    unnecessary sentencing disparities.  The guidelines are

10    provided to the Court to ensure sentencing consistency for

11    these types of offenses.

12        Now, admittedly, there weren't many offenses of this type

13    now that the Court can refer to.  However, I will note for the

14    Court at least two cases that have been cited substantially by

15    the parties in pretrial litigation.  I'll turn the Court's

16    attention to Ninth Circuit *Pascucci* as well as Second Circuit

17    *Jackson.*

18        *Pascucci* involved attempted extortion.  Not completed

19    extortion, Your Honor.  Attempted extortion of only $5,000.

20    The defendant in that case did not bring a firearm to the

21    meeting where he attempted to recover the proceeds, and the

22    defendant in the *Pascucci* case did not continue attacking the

23    victim, based on the record we have.  In that case, the Court

24    sentenced the defendant to 36 months, beyond what the defense

25    here is asking.

       *Jackson,* Your Honor, also involved attempted extortion,
not completed extortion as we have here.  No financial loss as
we have here.  No evidence of a gun as we have here.  And the
main protagonist in that case received 63 months.

       Your Honor, in this case, there was substantial extortion
that spanned weeks.  Substantial harm to the victim.  There's a
need to send a message of general deterrence and to promote
respect for the law, and the government would recommend a
within-guideline sentence of 80 months.

       Thank you, Your Honor.

       THE COURT:  What about Mr. Yim?  He got probation.  If
you're talking about sentencing disparity, don't we have to
focus on Mr. Yim, who was actually the individual who was
responsible for obtaining the weapon, and he was the individual
who was in the car with the weapon, and at least Mr. Brank
expected him to use the weapon in the case of trouble?  I
believe, my memory serves me, Mr. Yim was not on board with
that concept, but how do you justify the within-guideline
sentence and Mr. Yim receiving a probationary sentence, to
which he immediately went out and violated the terms of his
supervised release?

       MS. JAIMEZ:  Your Honor, Mr. Yim was not involved in
the extortion, and most importantly --

       THE COURT:  He wasn't involved in the extortion?  Then
what was he doing in the Starbucks parking lot with a gun on

1    the day in question when Mr. Brank was there to pick up the

2    million dollars?

3            MS. JAIMEZ:  He wasn't -- correction, Your Honor.  He

4    was not involved with the initial planning of the extortion, as

5    Brank was.  And most importantly, Your Honor, the defendant Yim

6    who you're referring to only obtained the gun at Mr. Brank's

7    request.  It was the defendant who reached out to Mr. Yim to

8    find a gun.  It was the defendant who traveled to Mr. Yim's

9    acquaintance's house to obtain the gun and then traveled to

10   Los Angeles, separated it from the firing range equipment, put

11   it in his backpack, with ammunition, and made sure that it was

12   in the getaway car and told Mr. Yim to use it if necessary.

13           THE COURT:  All right.  You want a chance to --

14           MS. AHMAD:  No, Your Honor.  Nothing further.

15           THE COURT:  All right.  Is there any legal reason why

16   sentence should not be imposed?

17           MS. AHMAD:  No, Your Honor.

18           THE COURT:  All right.  In fashioning the sentence to

19   be imposed in this case, I've made an individualized assessment

20   based upon the facts and arguments presented by the parties,

21   and I've considered and applied all of the 3553(a) factors.

22   However, I wish -- I think it's important to discuss several of

23   those factors.

24      The first factor is the nature and circumstances of the

25   offense.  In my view, this is a very serious offense and

1   requires a substantial prison sentence.  Because the Court has

2   presided over numerous pretrial motions and hearings and the

3   actual trial of this case, I'm fully aware of the nature and

4   circumstances.  However, in summary:

5        The victim in this case met the defendant through a

6   pay-for-sex encounter in 2013.  As established at trial, the

7   victim is a wealthy executive who traveled in influential

8   circles and had an interest in younger, attractive men who

9   worked in the gay pornography industry.  After their initial

10  encounter, the victim began paying the defendant to refer other

11  actors in the pornography industry, and escorts, to him for

12  paid sexual encounters.  The victim continued to pay the

13  defendant for his sexual encounters with the defendant.  The

14  victim paid the defendant for sex approximately four times, and

15  for referrals about the same number of times.  In each

16  instance, the defendant received approximately $1,500 to

17  $2,000.

18       The pay-for-sex arrangement between the victim and the

19  defendant began to deteriorate in early 2015 when the defendant

20  refused to return a referral fee for a sexual encounter that

21  never happened.  The defendant became upset and angry when the

22  victim told the defendant that he did not think or believe that

23  they could continue to have a working relationship.

24  Thereafter, the defendant proceeded to send the victim a series

25  of threatening text messages warning the victim that he was,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   quote, feeling evil, end of quote, and he could bring the

2   victim's house down.  Specifically, the defendant warned the

3   victim that he had a Twitter account and that -- and I'm

4   quoting -- lies can be made, closed quote, and truths told

5   through that medium.

6        The defendant's text messages and his, in my view,

7   outrageous conduct in this case, clearly evidence the

8   defendant's evil and criminal intent.  The text messages are

9   quoted at length at pages 3 and 4 of the government's

10  sentencing memorandum and will not be repeated here.

11       What's always been, in my view, the most damming evidence

12  of the defendant's incredible and outrageous greed is the fact

13  that after successfully extorting the victim out of $500,000

14  and an automobile worth $180,000, he didn't simply enjoy the

15  car and the money, which was significantly more than the

16  defendant had ever earned in his lifetime.  Instead, he

17  embarked upon a plan or a scheme to extort an additional

18  million dollars from the victim in March of 2015.  As that

19  scheme to extort an additional one million dollars unfolded,

20  he enlisted the assistance of his friend, Mr. Yim, who I've

21  discussed with government counsel, who obtained a .357 Colt

22  revolver that they brought with them to the Starbucks on

23  March 4, 2015, where the delivery or the exchange of the

24  one-million-dollar payment was to take place.

25       Prior to the exchange, the defendant told the victim over

1    the phone that he was not coming alone, that if anything else

2    should happen, he had what he needed for anything else.

3    Moreover, the defendant's friend and companion that evening,

4    Mr. Yim, testified at trial that defendant told him to use the

5    weapon if anyone started shooting at the defendant.  The

6    defendant was adamant and continuing his efforts to extort an

7    additional one million dollars, and if anything should go

8    wrong, if the feds should show up, for example, based upon the

9    evidence at trial, the defendant was prepared to use force.

10        The defendant seeks to downplay the existence of the gun

11   and correctly notes that it was Yim who provided gun, that it

12   was not loaded and not on the defendant's person but in the

13   car.  However, it was defendant's idea to obtain the gun and

14   bring the gun to the Starbucks, and in statements as to what

15   Yim was expected or supposed to do if defendant was shot at,

16   clearly suggest that he expected Mr. Yim to use the gun if

17   trouble occurred.

18        What's even more troubling, is even after the defendant

19   was arrested, he continued his efforts to hurt or harm the

20   victim in this case.  As the government points out and is seen

21   from Exhibits 3 and 4, the defendant tried and ultimately did

22   release a statement to the media where he portrayed himself as

23   an innocent victim and accused the victim of criminal acts.

24   Defendant suggested that the victim had raped him and was a

25   sexual predator.  As the Court recalls from the various

1    hearings in this case, he also falsely accused the victim of

2    sexual contact with minors, which the government undertook an

3    investigation and ultimately concluded that those claims were

4    false.

5         At the same time that the defendant was continuing his

6    efforts to hurt the victim, the defendant was attempting to

7    communicate, in my view, a phony apology to the victim, hoping

8    that the victim would drop the charges against him.

9         As to the history and characteristics of the defendant, I

10   agree with counsel's arguments that this is a case that is

11   above most of the cases that the Court sees in terms of the

12   abuse that the defendant suffered during his childhood.  As the

13   defendant's sentencing memo points out and the presentence

14   report notes, Mr. Brank is the seventh of ten children born to

15   his immigrant parents, who moved to the United States when

16   Mr. Brank was very young.  Mr. Brank's parents inflicted

17   unimaginable pain on him.  Mr. Brank's father would grab him by

18   the throat, slam him against walls and tables.  The defendant

19   was whipped with a vacuum cord and beaten with wooden spoons

20   and belts.  Defendant's father chained him to his bed, chained

21   him to a post outside, telling the defendant that now he knows

22   how animals feel.

23        The abuse suffered by Mr. Brank came from his mother as

24   well.  She had a violent temper, and on one occasion, as

25   counsel points out, threw knives at two of her children.  And

1    it was the defendant who witnessed his mother's hanging by her

2    neck in the family garage in an attempted suicide.

3        The defendant clearly lacked parental affection and

4    supervision as a child.  As described in the presentence

5    report, the defendant and his siblings would escape their

6    abusive home by wandering around the neighborhood and playing

7    at friends' homes.

8        When Mr. Brank was very young, he was also molested by a

9    neighbor.  And the description of the conduct, the criminal

10    conduct by that neighbor as against Mr. Brank, is described in

11    the revised presentence report, and I'm not going to go into

12    that now, out of respect for Mr. Brank's privacy.

13        The defendant's siblings have declined to provide

14    sentencing letters that discuss family abuse, out of fear of

15    revealing information of a criminal nature about their parents.

16    However, a letter has been submitted by one of Mr. Brank's

17    sisters, as well as several friends, and those letters have

18    been helpful to the Court in trying to understand the

19    defendant.  In addition, defense counsel has spoken with

20    several of Mr. Brank's siblings and confirmed the abuse by his

21    parents that has been extensively described in the presentence

22    report and the defendant's sentencing memorandum.  The defense

23    counsel has also confirmed that one of defendant's brothers

24    also suffered sexual abuse by one of the neighbors that abused

25    Mr. Brank.

1    The defendant does have a criminal record; however, I

2  conclude that the criminal history category of III is somewhat

3  overstated, because the record primarily consists of

4  traffic-related offenses.  However, what is troublesome about

5  his record is that he has a history of physically abusing his

6  spouse.  Although the presentence report indicates he was only

7  18 or 19 years old at the time of these incidents, he does have

8  a history of hitting women, which, in my view, such conduct is

9  inexcusable.

10    The defendant has substance abuse issues that are detailed

11  in the presentence report and the defendant's sentencing

12  position paper and suggest that those issues contributed to his

13  poor decisions, making his attempts or efforts to extort

14  millions of dollars from the victim.  Although I accept his

15  argument, I'm convinced that defendant's decisions in this case

16  were motivated by plain, old-fashioned greed.

17    The defendant does have the love and support of his

18  girlfriend and those friends that have submitted letters on his

19  behalf.  I provided counsel with a second letter from

20  Mr. Hattig, who recognized immediately that the evidence

21  against the defendant was overwhelming, and apparently who, to

22  no avail, tried to convince the defendant to plead guilty.  I

23  still don't quite understand why he has taken such an interest

24  in the defendant or his case; however, his interest apparently

25  is sincere, genuine and innocent and as a result of his

1  friendship.  I do recall that at one or maybe more than one

2  hearing, I had some rather harsh words about him, and although

3  I may have suggested that he was involved in some wrongdoing, I

4  can see now that my suspicions were totally unfounded.  He is

5  certainly correct in his letter that if the defendant had

6  accepted responsibility and entered a plea of guilty, he would

7  be facing a significantly lower sentence.  However, to suggest

8  that the defendant's attorneys had not properly advised him is,

9  as I've indicated before, absurd.

10      The defendant's attorneys provided him with outstanding

11  advice and representation.  Unfortunately, when confronted with

12  a client such as defendant, who refuses to accept

13  responsibility and cannot be convinced that their expectations

14  of acquittal are totally unrealistic, there is no alternative

15  but to try the case.  Of course, based upon the overwhelming

16  evidence the government had against him, counsel's job was not

17  only an uphill battle, but virtually impossible, because there

18  was virtually no viable defense to these charges.

19      However, I do want to note that the defense motion

20  practice in this case was excellent, and as I indicated before,

21  with the result of the suppression of the gun and ultimately

22  with the help of the Supreme Court, the Court dismissed the

23  924(c) count, which of course would have added an additional

24  five-year consecutive sentence.  And now that the government

25  has dismissed its appeal of the 924(c) count, the defendant is

1    no longer at risk of a consecutive five-year sentence.

2         As I indicated, the presentence report indicates that the

3    defendant's worked in the gay pornography industry as an actor

4    for several years, and when not acting, he worked as a

5    residential painter.  And although he has been employed, he has

6    very little to show for it and has a negative net worth of

7    approximately $15,000.

8         I've also considered and taken into account the advisory

9    guideline range, and the Court finds that the advisory

10   guideline range adequately takes into consideration the

11   specific facts and circumstances of this case and that the

12   range established by the guidelines is sufficient to satisfy

13   the purposes of sentencing.

14        The next factor that I have considered is unwarranted

15   sentencing disparity, and I have considered this factor and

16   conclude that to the extent any disparity exists, it's not

17   unwarranted, and it's fully justified by the unique

18   circumstances of this case, which include the presence of

19   significant aggravating factors.

20        I've also taken into consideration and will enter an order

21   of restitution in the amount of $500,000.

22        In fashioning the sentence in this case, I've also

23   considered the goals or purposes of sentencing, and I conclude

24   that the Court's sentence is sufficient but not greater than

25   necessary to meet the four purposes of sentencing.  I've

already concluded that this is a very serious offense and requires a sentence that will promote respect for the law and provide just punishment.

As to deterrence, the Court concludes that given the facts of this case, both specific and general deterrence are appropriate to goals of a just sentence.  Specific deterrence will discourage this defendant from committing such crimes again, and general deterrence will be satisfied because the sentence will send a clear message that this type of crime will not be tolerated by the law, and hopefully it will discourage others from committing such a crime.

A related and justifiable reason for punishment in this case is the legitimate concern that anything but a substantial prison sentence would be rightly regarded as deprecating the seriousness of this crime.

So for all of the foregoing reasons, the Court imposes the following sentence:

It is ordered that the defendant shall pay to the United States a special assessment of $600, which is due immediately.  Any unpaid balance shall be due during the period of imprisonment at the rate of not less than $25 per quarter and pursuant to the Bureau of Prisons' Inmate Financial Responsibility Program.

It is ordered that the defendant shall pay restitution in the total amount of $500,000 to the victim in this case

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    pursuant to 18 United States Code, Section 3663(a).

2         Restitution shall be due during the period of imprisonment

3    at the rate of not less than $25 per quarter and pursuant to

4    the Bureau of Prisons' Inmate Financial Responsibility Program.

5    If any amount of restitution remains unpaid after release from

6    custody, nominal monthly payments of at least 10 percent of the

7    defendant's gross monthly income, but not less than a hundred

8    dollars, whichever is greater, shall be made during the period

9    of supervised release and shall begin 30 days after the

10   commencement of supervision.  Nominal restitution payments are

11   ordered, as the Court finds that the defendant's economic

12   circumstances do not allow for either immediate or future

13   payment of the amount ordered.

14        Pursuant to 18 United States Code, Section 3612(f)(3)(A),

15   interest on the restitution ordered is waived, because the

16   defendant does not have the ability to pay interest.  Payments

17   may be subject to penalties for default and delinquency

18   pursuant to 18 United States Code, Section 3612(g).

19        The defendant shall comply with General Order 01-05.

20        All fines are waived, as it is found that the defendant

21   does not have the ability to pay a fine in addition to

22   restitution.

23        The Court has entered a money judgment of forfeiture

24   against the defendant, which is incorporated by reference into

25   this judgment and is final.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1          Pursuant to the Sentencing Reform Act of 1984, it's the

 2     judgment of the Court that the defendant is hereby committed on

 3     Counts 1 through 6 of the first superseding indictment to the

 4     custody of the Bureau of Prisons for a term of 70 months.  This

 5     term consists of 70 months on each of Counts 2 and 5 of the

 6     first superseding indictment, 60 months on Count 6 of the first

 7     superseding indictment, 36 months on each of Counts 3 and 4 of

 8     the first superseding indictment, and 24 months on Count 1 of

 9     the first superseding indictment, all to be served

10     concurrently.

11          Upon release from imprisonment, the defendant shall be

12     placed on supervised release for a term of three years.  This

13     term consists of three years on each of Counts 2, 5, and 6 of

14     the first superseding indictment, and one year on each of

15     Counts 1, 3, and 4 of the first superseding indictment, all

16     such terms to run concurrently under the following terms and

17     conditions:

18          1.  The defendant shall comply with the rules and

19     regulations of the U.S. Probation Office, General Order 05-02

20     and General Order 01-05, including the three special conditions

21     delineated in General Order 01-05.

22          2.  During the period of community supervision, the

23     defendant shall pay the special assessment and restitution in

24     accordance with this judgment's orders pertaining to such

25     payment.

3.    The defendant shall cooperate in the collection of a DNA sample from the defendant.

4.    The defendant shall not commit any violation of local, state, or federal law or ordinance.

5.    The defendant shall comply with the immigration rules and regulations of the United States, and if deported from this country either voluntarily or involuntarily, not re-enter United States illegally.  The defendant is not required to report to the probation officer while residing outside of the United States; however, within 72 hours of release from any custody or re-entry to the United States during the period of court-ordered supervision, the defendant shall report for instructions to the U.S. Probation Office located in this building.

6.    The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment, and at least two periodic drug tests thereafter, not to exceed eight tests per month, as directed by the probation officer.

7.    The defendant shall participate in an outpatient substance abuse treatment and counseling program that includes urinalysis, breath and/or sweat patch testing, as directed by the probation officer.  The defendant shall abstain from using alcohol and illicit drugs and from abusing prescription medications during the period of supervision.

8.   During the course of supervision, the probation
officer, with the agreement of defendant and his counsel, may
place the defendant in a residential drug treatment program
approved by the United States probation officer for the
treatment of narcotic addiction or drug dependency, which may
include counseling and testing to determine if the defendant
has reverted to the use of drugs, and the defendant shall
reside in the treatment program until discharged by the program
director and the probation officer.

9.   As directed by the probation officer, the defendant
shall pay all or part of the cost of treating the defendant's
drug dependency to the aftercare contractor during the period
of community supervision pursuant to 18 United States Code,
Section 3672.  The defendant shall provide payment and proof of
payment as directed by the probation officer.

10.  The defendant shall apply all monies received from
any income tax refunds to the outstanding court-ordered
financial obligation.  In addition, the defendant shall apply
all money received from lottery winnings, inheritance,
judgments, any other anticipated or unexpected financial gains
to the outstanding court-ordered financial obligation.

The Court authorizes the probation officer to disclose the
presentence report to the substance abuse treatment provider to
facilitate the defendant's treatment for narcotic addiction or
drug dependency.  Further disclosure of the presentence report

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   by the treatment provider is prohibited without the consent of

2   this Court.

3       I want to advise the defendant that if you wish to appeal

4   your conviction and your sentence, you must file a notice of

5   appeal within 14 days of today or you will lose your right to

6   an appeal.  If you're unable to afford an attorney for your

7   appeal, one may be appointed at no cost to you.

8       I will make a recommendation that the defendant be

9   permitted to participate in the Bureau of Prisons' RDAP

10  program.

11      Do you want me to make a recommendation in terms of a

12  location?

13          MS. AHMAD:  Your Honor, Mr. Brank would like to remain

14  within Southern California, if possible.

15          THE COURT:  All right.  I will make a recommendation

16  to the Bureau of Prisons for a Southern California designation.

17          MS. AHMAD:  Just one other issue, Your Honor.

18      On the restitution amount, I've conferred with government

19  counsel from the forfeiture section, and my understanding is

20  that once the judgment -- J & C is final, the funds that were

21  seized from Mr. Brank will be a credit against the restitution,

22  and so I believe government counsel and I are in agreement that

23  the balance will be $54,004.40.

24          THE COURT:  Well, but I'm going to continue the amount

25  of restitution in the judgment of conviction, and then he'll

```
 1    get a credit for that.
 2         All right.  Anything else?
 3              MS. JAIMEZ:  Not from the government, Your Honor.
 4              MS. AHMAD:  Nothing further, Your Honor.
 5              THE COURT:  All right.  Thank you very much.
 6         Oh, the clerk has just advised me, or told me, or
 7    suggested to me that the government should have a motion with
 8    respect to the underlying indictment in this case.
 9              MS. JAIMEZ:  Could you clarify, Your Honor?
10              THE COURT:  You're going to dismiss the underlying
11    indictment?
12              MR. JAUREGUI:  The what indictment?
13              MS. JAIMEZ:  The underlying indictment?
14              THE COURT:  He was sentenced on the first superseding
15    indictment.
16              MR. JAUREGUI:  Correct.
17              MS. JAIMEZ:  Oh, yes.
18              THE COURT:  So we have an underlying indictment.
19              MS. JAIMEZ:  Yes, Your Honor.  The government --
20              THE COURT:  So is the government going to move to
21    dismiss the underlying indictment?
22              MS. JAIMEZ:  Yes, Your Honor.
23              THE COURT:  All right.  That motion will be granted.
24              MS. JAIMEZ:  Thank you, Your Honor.
25              MS. AHMAD:  Thank you, Your Honor.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          THE COURT:  All right.  Thank you very much.

2          THE CLERK:  All rise.

3      This court is adjourned.

4

5          *(Proceedings concluded at 10:14 a.m.)*

6

7              *--oOo--*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

<u>*CERTIFICATE*</u>

*I hereby certify that pursuant to Section 753,*
*Title 28, United States Code, the foregoing is a true and*
*correct transcript of the stenographically reported proceedings*
*held in the above-entitled matter and that the transcript page*
*format is in conformance with the regulations of the*
*Judicial Conference of the United States.*

*Date:  OCTOBER 28, 2015*


*/S/ SANDRA MACNEIL*
*Sandra MacNeil, CSR No. 9013*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA